**UNITED STATES v. KUSCHE.**

**Civil Action No. 2425–PH.**

District Court, S. D. California,
Central Division.

June 13, 1944.

Charles H. Carr, U. S. Atty., successor to Leo V. Silverstein, John Marvin Dean, Asst. U. S. Atty., all of Los Angeles, Cal., for plaintiff.

Eugene L. Graves, of Bell, Cal., for defendant.

A. L. Wirin and Nathan Newby, both of Los Angeles, Cal., amici curiae, by appointment of the Court.*

HALL, District Judge.

Preliminary Statement.

This is a denaturalization proceeding brought under 8 U.S.C.A. § 738, formerly Section 15 of the Naturalization Act of 1906.

It is one of a series of cases prosecuted by the Government in different District Courts throughout the country. They have become known as the "Bund" cases, be-

---

\* At the commencement of the trials, several of the defendants were without counsel, and stated that they were unable to employ counsel. Before proceeding further the Court appointed Mr. A. L. Wirin to act as Amicus Curiae to represent the rights of the defendants who were unrepresented. During the course of the trials, each defendant subsequently secured his own private counsel, but at the request of the Court Mr. Wirin and Mr. Newby submitted briefs and argued the general questions involved.

cause the grounds of cancellation are based upon the defendants' alleged membership in the "German-American Bund."

In this District there were 27 such cases. Twenty-six of them were consolidated by stipulation, and one (Schultz) by order over the objection of the defendant, for the sole purpose of receiving testimony on one issue, only, viz., the nature and character of the "Bund", which was to be, and was, done first; thereafter each case was to, and did, proceed individually. Since the conclusion of the evidence, four have been dismissed by the Government and one defendant has died, leaving 22 pending for decision.

At the time set for the commencement of the trial, various defendants, by appropriate and timely objections, and motions, raised the question as to the sufficiency of the complaint, the admissibility of any evidence relating to the nature and character of the "Bund," the admissibility of any evidence concerning the defendant's membership in and connection with and activities in and about the "Bund" and the general admissibility of evidence under the complaint. All of these ordinarily would be settled before or at the commencement of the trial. But they were not in this instance, for several reasons; a number of the Government's witnesses were brought here in custody from Penitentiaries in the east; they, as well as several of the other Government witnesses were scheduled to appear at other trials of similar cases in other districts in the country; several of the defendants having been previously excluded from this area by order of the military authorities, were brought here as Government witnesses at considerable Government expense, to say nothing of the formalities necessary to permit their return by the Army; other defendants who were here at their own expense which they claimed they could ill afford, and with no less formalities, were willing to proceed on the basis hereinafter mentioned; and the Assistant United States Attorney, who with the Naturalization Department had done a tremendous task of preparation[1] was anxious to conclude the trial so that he could commence the service of his enlistment in the Navy, and it would have delayed beyond good sense the entire proceeding, had some other lawyer been compelled to examine, to the point of understanding, the vast amount of material for purposes of the trial.

So the cases proceeded to trial, and were tried on all issues; but all objections to the sufficiency of the complaint, the general admissibility of the evidence and other objections which went to the general legal issues involved were overruled, with the distinct understanding and consent of all parties that their rights under such objections would be preserved to them to be ruled on at the conclusion of the case. Appropriate and timely motions to strike, motions for judgment, and other proper expressions to the record were made by the defendants for the preservation of these rights.[2]

In addition to that, by express consent in all the cases (except the Specht case) all legal issues raised in all cases were to be considered as having been raised in each case.[3]

At the conclusion of the evidence both the Government and the defendants were permitted to and did, without objection, amend the pleadings to conform to their conceptions and contentions.

While this memorandum is addressed to the within entitled case many of the questions herein considered are nevertheless common to most, if not all the cases.

So much has been written and so many cases reported on the subject that I have hesitated to reduce my views to writing. But the complexity of the subject will permit neither presentation nor solution except by comprehensive statement.

---

[1] There was a total of 381 witnesses and 792 exhibits, ranging from one sheet of paper to whole books, pamphlets, and entire issues of newspapers, most of which were in German.

[2] This being a common practice, it is not supposed that authority is needed to support it. But if so, reference is made to United States v. Burr, 25 Fed.Cas., 201, at page 202, No. 14,694a, where it is noted that "the counsel for the prosecution then proceeded with their testimony. The door was thrown wide open, and nearly everything offered was received, subject to future objection, if it should appear not to be relevant to the charges under investigation.

[3] Rule 15, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. "When issues not raised by the pleadings are treated by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

Before doing so, I feel that I should say that I cannot escape the consciousness that we are here dealing with people who were born and raised as Germans, and that twice within my generation the German nation has precipitated the unspeakable horrors of modern war upon the world. These things must not, indeed they cannot, be permitted to shade in the slightest the rules of law and reason applicable to these controversies. I make these statements, not with the idea that they have any bearing on the law of the case, but because they are present in the minds of every one connected with these cases, and it is simply much better that they be said than unsaid.

The opening comment of Mr. Justice Holmes in his first dissent in the Supreme Court is helpful by way of introduction to the treatment of the questions here, Northern Securities Co. v. United States, 193 U.S. 197 at page 400, 24 S.Ct. 436, at page 468, 48 L.Ed. 679:

"I am unable to agree with the judgment of the majority of the court, and although I think it useless and undesirable, as a rule, to express dissent, I feel bound to do so in this case and to give my reasons for it.

"Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend. What we have to do in this case is to find the meaning of some not very difficult words. We must try,—I have tried,—to do it with the same freedom of natural and spontaneous interpretation that one would be sure of if the same question arose upon an indictment for a similar act which excited no public attention, and was of importance only to a prisoner before the court. Furthermore, while at times judges need for their work the training of economists or statesmen, and must act in view of their foresight of consequences, yet, when their task is to interpret and apply the words of a statute, their function is merely academic to begin with,—to read English intelligently,—and a consideration of consequences comes into play, if at all,

only when the meaning of the words used is open to reasonable doubt."

### The Complaint.

In substance, the complaint as finally amended, first recites (a) defendant's arrival in the United States on November 1, 1923; (b) the filing of his petition for citizenship on November 2, 1929, containing the customary statement of attachment and intentions of allegiance and residence; (c) the taking of his oath of allegiance, in the form required, and the making of the order of admission and the issuance of the certificate thereon on the 9th day of May, 1930; and (d) his previous nativity and citizenship in Germany. The complaint then asserts that the defendant induced the plaintiff by the representations of attachment to the principles of the Constitution in his petition for naturalization and his oath of allegiance to rely thereon and to issue him the certificate of naturalization on May 9, 1930, and that the certificate was issued in reliance upon these representations. It then alleges: (1) That between July 1, 1934, and about July 1, 1941, the defendant was a member of the "Bund," "which (a) advocated and demanded of each of their adherents, regardless of his status as a citizen of the United States, a lack of attachment to the principles of the Constitution of the United States, and an ill-disposition on his part to the good order and happiness of the United States; (b) encouraged, fostered and demanded in their adherents supreme and unswerving allegiance and fidelity to Germany; (c) engaged in the furtherance of the totalitarian principles of German National Socialism, said principles being inconsistent with and opposed to the principles of the Constitution of the United States, all to the end that their adherents would fail to support and defend the Constitution and laws of the United States, against all enemies, foreign and domestic;" (2) that defendant during his period of membership in the Bund knew that such were the purposes and functions of the Bund and that the defendant approved of and believed in, both at the time he took the oath of citizenship and subsequent thereto, the principles, policies, and purposes of the said Bund as above set forth; (3) that "during said period" of his membership in the Bund the defendant "by statement and conduct indicated" that he did not intend to reside permanently in the

United States, that he was not attached to the principles of the Constitution, and that he reserved allegiance to the German Reich.

No statement of the defendant, either in substance or otherwise, is set forth in the complaint, and no conduct except his joinder of the Bund four years after admission.

Upon the basis of these allegations it is asserted that his statements of (1) attachment to the principles of the Constitution; (2) his intention to swear allegiance to the United States and renounce allegiance to Germany; (3) his intention to reside permanently in the United States contained in his petition for citizenship, were false, as well as the same or similar representations and facts contained in his oath, and that the certificate of naturalization was hence procured by the defendant "fraudulently and illegally."

In short: The gravamen of the complaint is that the defendant did not intend to reside permanently in the United States; that he did not become attached to the principles of the Constitution and did not forswear allegiance to Germany, but that he falsely swore that he did; that the proof of such false swearing and lack of intention to reside here permanently is his membership in and activities about the "Bund" and that thus the order of admission and certificate were "fraudulently and illegally" procured and should be vacated and cancelled.

### Defendant's Objections.

The objections which the defendants urge, may be broadly and briefly stated as follows:

First, that the Government is guilty of laches;

Second, that the Nazi Government of Hitler did not come into power in Germany until 1933; that this form of Government in Germany was hence a new "State," and that thus the defendant could not have had allegiance in 1930, when he took his oath, to a "State" which did not then exist, either in Germany or anywhere else in the world, and which did not come into existence until three years later;

Third, that evidence of any act or any conduct of the defendant subsequent to the judgment of naturalization is not admissible;

Fourth, that the judgment of admission is res judicata as to the petitioner's attachment and allegiance, and is not subject to attack under Section 15 of Act June 29, 1906, 34 Stat. 601, 8 U.S.C.A. § 405, for "illegal procurement," but only for extrinsic fraud, and that the complaint does not state any facts to support a charge of extrinsic fraud; and hence does not state facts sufficient to constitute a cause of action.

Fifth, that the conduct ascribed to the defendant was an exercise of the right of freedom of thought and freedom of speech and freedom of assembly, guaranteed by the first amendment to the Constitution of the United States.

Each of these objections goes to the sufficiency of the complaint, and the right to introduce any evidence. Where proper and timely objection is made, as here, these are the first questions which must be settled in every law suit. They will now be examined, and the objections will be considered in the order stated.

### First Objection.

As a general proposition laches will not lie against the Government.

There are some instances where it will. As said in State of Iowa v. Carr, 8 Cir., 1911, 191 F. 257, at page 266: "The equitable claims of a state or of the United States appeal to the conscience of a chancellor with the same, but with no greater or less force than would those of an individual under like circumstances" (citing United States v. Stinson, 197 U.S. 200, 25 S.Ct. 426, 49 L.Ed. 724, and other cases).

Ordinarily it is a matter of defense, but, if its elements are apparent on the face of the complaint, it is available to the defendant in objecting to the sufficiency of the complaint. Sullivan v. Portland, etc., R. Co., 1876, 94 U.S. 806, 24 L.Ed. 324.

One of the essential elements of laches is that the defendant in reliance upon the delay of the plaintiff, has changed his position so that he cannot be restored to his former state, if relief is granted to the plaintiff.

This element is lacking on the face of the complaint, and the defendant's objection to the introduction of any evidence, and to the sufficiency of the complaint on that ground must be and is overruled.

### Second Objection.

The second objection of the defendant involves a proposition which is com-

mon knowledge, and of which the court can take judicial notice, viz., that when Hitler came to power in 1933 he suspended the personal liberty provisions of the Weimar Constitution of 1919 claiming to act under the power of another provision of that Constitution and thereupon and thereafter he established an absolute dictatorship based upon the tenets of national socialism. That was a new Government, and was, so the contention goes, in fact a new "State," as that term is used in the oath of allegiance and Naturalization Laws of the United States; and that hence at the time defendant took his oath of allegiance to the United States in 1930 he could not have reserved allegiance to a government, which not only did not then exist in Germany or anywhere else in the world, but which no one had any way of knowing would ever come into power and which did not come into existence for three years.

The pertinent language of the oath follows:

"I hereby declare on oath that I absolutely and entirely renounce and abjure any allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which I have heretofore been a citizen."

In 1930 Germany was not governed by either a prince, or a potentate; nor was it governed by a sovereignty in the sense of an individual ruler. The question then remains whether or not the word "State" as used in the renunciation is intended to describe merely a form of government, or has a more comprehensive meaning. "Reich" is the German word for "State" so that the question is not changed by specific renunciation to the "German State."

The word "State" as used in the oath of allegiance, of course conveys a different meaning or conception than the word when used to describe one of the "states" of the Union, and is used in the international sense.

It is thus necessary to have recourse to International Law to ascertain what is meant by "State."

"Nation" has a more limited meaning than state; for instance the American Indian tribes were referred to as "Nations," viz., "Creek Nation," etc., "Iriquois Nation," "Cherokee Nation." It is significant that the oath does not use the word "nation."

Moore's Digest of International Law printed in the Government printing office at Washington in 1906 defines "state" as follows:

"For all purposes of International law, a state (onuos, civitas, volk) may be defined to be a people permanently occupying a fixed territory (certam sedem), bound together by common laws, habits, and customs into one body politic, exercising, through the medium of an organized government, independent sovereignty and control over all persons and things within its boundaries, capable of making war and peace, and of entering into all international relations with the other communities of the globe. It is a sound general principle, and one to be laid down at the threshold of the science of which we are treating, that international law has no concern with the form, character, or power of the Constitution or government of a state, with the religion of its inhabitants, the extent of its domain, or the importance of its position and influence in the commonwealth of nations. * * * Provided that the state possesses a government capable of securing at home the observance of rightful relations with other states, the demands of international law are satisfied. (Phillimore, Int. Law 3rd ed., I, 81.) * * * The legal idea of a state necessarily implies that of the habitual obedience of its members to those persons in whom the superiority is vested, and of a fixed abode, and definite territory belonging to the people by whom it is occupied. * * *

"Rivier, in his treatise on international law, enumerates, as 'the essential elements of the state' which he defines as 'an independent community, organized in a permanent manner on a certain territory,' the following: Territory and population, collective will and government, independence and permanence."

Hackworth in his Digest of International Law (Official Publication of Department of State, 1940), Vol. 1, Chap. 2, p. 47, defines "state" as follows:

"The terms *state* and nation are frequently used interchangeably. The term *nation*, strictly speaking, as evidenced by its etymology (*Nasci* to be born) indicates relation of birth or origin and implies a common race, usually characterized by community of languages and customs. The term *state*—a more specific term—connotes, in the international sense, a people permanently occupying a fixed territory, bound

together by common laws and customs into a body politic, possessing an organized government, and capable of conducting relations with other states. The term thus refers to an organization or institution—a relation between people. States, generally speaking, may be broadly classified as sovereign or independent states and as dependent or semi-sovereign states."

Webster, 2nd Ed., 1942, defines it among other things as "a political body or body politic; any body of people occupying a definite territory and politically organized under one government, especially one that is a sovereign or not subject to external control," and gives as obsolete the definition that a state is "a form of government."

The Oxford Dictionary, 1933 Ed., has two definitions in relation to the subject matter: Definition No. 29. "The state: a body politic as organized for supreme civil rule and government; the political organization which is the basis of civil government either generally and abstractly or in a particular country; hence the supreme civil power and government vested in a country or nation." 30. "A body of people occupying a defined territory and organized under a sovereign government."

The authority on international law extant at the time of the Constitutional Convention and adoption of the first Naturalization Law, was that published by M. De Vattel. It was originally translated from the French in 1773.[4] I do not have that edition available, but in the edition of 1792, published in Dublin the same definition of "state" is found as that contained in the subsequent American edition published in 1879, translated from the French by Joseph Chitty. That definition is,

"Nations or states are bodies politic, societies of men united together to procure their mutual safety and advantage by means of their union.

"Such a society has its affairs and interest, it deliberates and takes resolutions in common, and thus becomes a moral person, having an understanding and a will peculiar to itself, and is susceptible of obligations and laws."

\*　　\*　　\*　　\*　　\*

"The authority of all over each member, therefore, essentially belongs to the body politic, or to the states; but the exercise of that authority may be placed in different hands according as the society shall ordain.

"If the body of the nation keeps in its own hands the empire, or the right of command, it is a popular government, a democracy; if it refers to a certain number of citizens, to a senate, it establishes a republic, an *aristocracy,* in short, if it confides the government to a single person, the state becomes a *monarchy."*

\*　　\*　　\*　　\*　　\*

"Every nation that governs itself, under what form so ever, without any dependence on a foreign power, is a *sovereign state."*

There was thus at that early date in the history of this country a sharp distinction made between a "state" and its government which has continued to the present day.

■ Except for the definition which Webster states is obsolete that "state" means a form of government, and except for the quoted definition No. 29 of the Oxford Dictionary, the uniformly accepted definition seems to be the one given by Hackworth. It is that a "State" comprehends a body of people living in a territory who are not subject to any external rule, but who have the power within themselves to have any form of government which they choose and have the power to deal with other states.

■ Hitler refers to Germany at present as the "Third" Reich, and as having begun when he assumed power; the first Reich apparently was the government which existed up to the Weimar Constitution of 1919; the Second Reich was that of the Weimar Constitution. But even so I must follow the accepted international definition of "State"; and conclude that the German "State" when defendant took his oath in 1930, was the same German "State" which has existed since.

The defendant's point is not well taken. If the evidence were otherwise admissible this objection would not preclude it, and the objection to the introduction of any evidence and the sufficiency of the complaint on that ground is overruled.

Third and Fourth Objection.

The Third objection, that evidence of any act or conduct of the defendant subsequent to naturalization is not admissible, merges with and is treated as part of the fourth objection, that the judgment of naturalization is res judicata as to attachment and allegiance, and is not subject to

---

[4] It is said that three copies of it were available to the members of the Constitutional Convention.

attack on the ground of "illegal procurement" but only on the ground of extrinsic fraud, and that the complaint does not make out a case of extrinsic fraud.

These objections break into several questions, the first of which is whether or not the term "fraud" as used in Section 15, is synonymous with the term "illegally procured" as used in Section 15.

The Section in the pertinent provisions reads as follows:

"(a) It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 701 in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the *order* admitting such person to citizenship and canceling the certificate of naturalization on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured." 8 U.S.C.A. § 738.

This Section has remained substantially unchanged since the Act of 1906.[5]

Certainly, not all of the issues existing in this case and its companions are encompassed by an interpretation of that Section.

But a decision on that question will determine the boundaries within which the dispute shall remain.

While in these cases the Government relies only upon so-called lack of attachment to the principles of the Constitution, and lack of forswearance of allegiance to a foreign sovereign, which is described as "fraud and illegal procurement," it will be seen as the discussion proceeds that in order to have a comprehensive understanding of what Congress meant by this Section and the language used it is necessary to know what is *not included* within the terms, as *well as what is.*

Recourse to the reported cases, for precedent to assist in interpreting and applying the Section to the problems here, discloses that there has been much litigation under the Section, with confusing and contradictory results. In 1913 Judge Amidon in the Lenore [6] case, D.C., 1913, 207 F. 865, 867: suggested that Section would produce a "babel of conflicting judgments." And in 1918 in Kamm, D.C., 247 F. 968, 972, Judge Geiger commented upon the confusion which then existed among the decisions concerning the "scope and true application of this section." The four opinions written by the Supreme Court recently in the Schneiderman case, infra, which was twice argued, attest the present perplexity concerning matters arising under this Section.

In a serious effort, made in spite of these warnings, to find out what the correct rules of law are in connection with these matters, so as to be able to apply them, an examination was undertaken of the cases involving Section 15 which have been decided since the Act of 1906, so far as their reports could be found. They are compiled in the following table, which takes up to the commencement of the present war, but does not include any case decided since this war began except the Schneiderman case, Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

The table shows the impossibility of reconciliation of the decisions of the Courts, other than the Supreme Court. The classification made in the table is a broad one, as of necessity it must be, because as in all legal classifications, sharp lines cannot be drawn. In addition to the book and page, the name of the Court and the date of the decision is given. A classification by Circuit, with the District Courts within each

---

[5] The above language is changed slightly from that of the Act as it stood before the Nationality Act of 1940, but the changes introduced in 1940 are not material to this inquiry. At the time of the admission of this defendant the pertinent portion of the Act read as follows:

"(a) It shall be the duty of the United States district attorneys for the respective districts, * * * upon affidavit showing good cause therefor, to institute proceedings in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit, for the purpose of setting aside and canceling the certificate of citizenship on the ground of fraud or on the ground that such certificate of citizenship was illegally procured."

[6] In view of the fact that all of the cases involving naturalization have the U. S. as a party, the citations throughout of naturalization cases will omit that portion of the title of each case, and they will be cited by only the name of the individual litigant.

Circuit, was attempted, as well as a classification of the decisions with relation to the various amendments to the law as they were made from time to time. A classification was also made by attempting to group the elements declared to be either fraud or illegal procurement. But these classifications produced neither reconciliation nor approximate uniformity with regard to any feature involved in the instant case. Nor could any view be said to be "supported by the weight of authority," except as one might choose to follow one line of decisions or another. In fact almost any conclusion which might be reached could be buttressed by an imposing array of authorities to support it. But the gravity of the matters which press for decision, indeed the very confusion which exists, will not permit that kind of any easy escape from the questions here involved.

The table follows:

## I.

Noncontinuous Residence in the United States for Five Years Preceding Naturalization:

(a) Amounts to Fraud and/or Illegal Procurement Without Distinction:

| | | | | |
|---|---|---|---|---|
| Simon | 5/25/09 | COD MASS | 170 F. 680 | 7 months absence. |
| Johannessen | 5/27/12 | US SC | 225 U.S. 227, 32 S.Ct. 613 | Perjury re absence. |
| Di Giovine | 5/7/17 | DC WD NY | 242 F. 741 | 18 months absence. |
| De Tolna | 6/28/28 | DC ED NY | 27 F.2d 984 | Returned to Austria. |
| Moskowitz | 5/2/41 | DC RI | 39 F.Supp. 989 | 2 witnesses swore falsely as to knowing him. |

(b) Amounts to Fraud Alone:

| | | | | |
|---|---|---|---|---|
| Mansour | 8/18/08 | DC SD NY | 170 F. 671 | Intermittent absences. |
| Spohrer | 1/14/10 | CC DNJ | 175 F. 440 | Length not stated. |
| Schwinn | 5/10/40 | CCA 9th | 112 F.2d 74 | 2 witnesses had not known petitioner for 5 years. |

(c) Amounts to Illegal Procurement Alone:

| | | | | |
|---|---|---|---|---|
| Cantini | 4/21/14 | CCA 3rd | 212 F. 925 | 2 years absence. |
| Mulvey | 4/18/16 | CCA 2nd | 232 F. 513 | Absent two years. |
| Griminger | 10/12/16 | DC ND OHIO | 236 F. 285 | 2½ years absence. |
| Ginsberg | 4/9/17 | US SC | 243 U.S. 472, 37 S.Ct. 422 | 4 years 9 months absence. |
| Kummer | 5/29/24 | DC ED NY | 300 F. 106 | 2 years absence. |
| Martin | 12/10/25 | DC ED WIS | 10 F.2d 585 | 4 years absence. |
| Schwinn | 10/28/40 | US SC | 311 U.S. 616, 61 S.Ct. 70 | False witnesses to 5 years residence. |

(d) *Does Not* Amount to Fraud:

| | | | | |
|---|---|---|---|---|
| Yatsevitch | 6/6/29 | DC MASS | 33 F.2d 342 | Almost 5 years absence. |

(e) *Does Not* Amount to Illegal Procurement:

| | | | | |
|---|---|---|---|---|
| Deans | 2/16/16 | CCA 8th | 230 F. 957 | 2 and 4 months absence. |
| Shanahan | 4/8/16 | DC ED PA | 232 F. 169 | Absent several months. |
| Jorgenson | 12/2/16 | DC WD MICH | 241 F. 412 | Absent two years. |
| Srednik | 4/27/27 | CCA 3rd | 19 F.2d 71 | Length not stated. |
| Zilver | 1/26/32 | DC ED NY | 55 F.2d 250 | 1 year absence. |

(f) *Does Not* Amount to Fraud or Illegal Procurement:

| | | | | |
|---|---|---|---|---|
| Aakervik | 6/20/10 | DC OR | 180 F. 137 | 4½ years absence. |
| Rockteschell | 10/31/13 | CCA 9th | 208 F. 530 | Intermittent absences. |

## II.

Noncontinuous Residence in the United States for Five Years *Subsequent* to Naturalization:

(a) Amounts to Fraud and/or Illegal Procurement Without Distinction:

| | | | | |
|---|---|---|---|---|
| Luria | 1/27/11 | DC SD NY | 184 F. 643 | Almost 5 years absence. |
| Luria | 10/20/13 | US SC | 231 U.S. 9, 34 S.Ct. 10 | Almost 5 years absence. |
| Perrone | 6/17/27 | DC WD PA | 21 F.2d 583 | Absent 3 of 5 years. |

(b) Amounts to Fraud Alone:

| | | | | |
|---|---|---|---|---|
| Ellis | 3/3/11 | CC ED LA | 185 F. 546 | Absent 4 years 9 months. |
| Rothman | 4/11/27 | CCA 6th | 18 F.2d 577 | Absent 4 years 9 months. |

(c) Amounts to Illegal Procurement Alone:

No cases.

(d) *Does Not* Amount to Fraud:

| | | | | |
|---|---|---|---|---|
| Knight | 8/1/23 | DC MONT | 291 F. 129 | 4 years 1 month absence. |
| Perrone | 4/30/28 | CCA 3rd | 26 F.2d 213 | Absent 3 of 5 years. |
| Grenfeld | 8/10/29 | DC SD TEX | 34 F.2d 349 | Length of absence not stated. |
| Cohen | 3/27/40 | DC NJ | 32 F.Supp. 419 | Absent 3 years. |

(e) *Does Not* Amount to Illegal Procurement:

No cases

(f) *Does Not* Amount to Fraud or Illegal Procurement:

| | | | | |
|---|---|---|---|---|
| Jurick | 6/20/36 | DC ED NY | 16 F.Supp. 32 | Absent 2 years. |

## III.

Lack of Good Moral Character:

(a) Amounts to Fraud and/or Illegal Procurement Without Distinction:

| | | | | |
|---|---|---|---|---|
| Zaltzman | 4/27/37 | DC WD NY | 19 F.Supp. 305 | Adultery during preceding 5 years before naturalization. |
| Rutman | 6/8/39 | DC SD NY | 27 F.Supp. 891 | Falsely swore was single in petition. |
| Brass | 3/18/41 | DC ED NY | 37 F.Supp. 698 | Falsely stated not criminal during preceding 5 year period. |

(b) Amounts to Fraud Alone:

| | | | | |
|---|---|---|---|---|
| Raverat | 3/22/15 | DC MONT | 222 F. 1018 | Defendant a pimp. |
| Turlej | 2/21/29 | CCA 8th | 31 F.2d 696 | Viol. 18th Amendment before and after 5 year period. |
| De Francis | 5/4/31 | CT APP DC | 50 F.2d 497 | Nondisclosure of liquor violation. |
| Villaneuva | 11/30/36 | DC NEV | 17 F.Supp. 485 | Liquor violation before naturalization. |

(c) Amounts to Illegal Procurement Alone:

| | | | | |
|---|---|---|---|---|
| Wexler | 10/15/25 | DC ED NY | 8 F.2d 880 | Adultery during preceding 5 year period. |
| Mirsky | 5/12/26 | DC SD NY | 17 F.2d 275 | Violation 18th Amendment during preceding 5 years. |
| Unger | 5/9/28 | DC SD NY | 26 F.2d 114 | Adultery during preceding 5 year period. |

## IV.

Class "Ineligibility" Under Section 2169 R. S.: Title 8, Sec. 703, U.S.C.A.:

(a) Amounts to Fraud and/or Illegal Procurement Without Distinction:

| | | | | |
|---|---|---|---|---|
| Thind | 2/19/23 | US SC | 261 U.S. 204, 43 S.Ct. 338 | Hindu. |
| Toyota | 5/28/23 | DC MASS | 290 F. 971 | Japanese. |
| Gokhale | 5/21/28 | CCA 2nd | 26 F.2d 360 | Hindu. |

(b) Amounts to Fraud Alone:

No Cases

(c) Amounts to Illegal Procurement Alone:

| | | | | |
|---|---|---|---|---|
| Mozumdar | 11/30/23 | DC SD CAL | 296 F. 173 | Hindu. |
| Khan | 2/25/24 | DC WD PA | 1 F.2d 1006 | Hindu. |
| Mozumdar | 6/16/24 | CCA 9th | 299 F. 240 | Hindu. |
| Toyota | 5/25/25 | US SC | 268 U.S. 402, 45 S.Ct. 563 | Japanese. |
| Ali | 8/3/25 | DC ED MICH | 7 F.2d 728 | Hindu. |
| Javier | 11/7/27 | CT APP DC | 22 F.2d 879 | Filipino. |

(d) *Does Not* Amount to Fraud or Illegal Procurement:

| | | | | |
|---|---|---|---|---|
| Pandit | 11/1/26 | CCA 9th | 15 F.2d 285 | Hindu. |
| Pandit | 3/14/27 | US SC | 273 U.S. 759, 47 S.Ct. 473 | Hindu. |
| Gokhale | 11/19/28 | US SC | 278 U.S. 662, 49 S.Ct. 79 | Hindu. |

(e) Class Ineligibility: Miscellaneous: Amounts to Illegal Procurement:

| | | | | |
|---|---|---|---|---|
| Kamm | 1/3/18 | DC ED WIS | 247 F. 968 | Enemy alien. |
| Grahl | 1/3/18 | DC ED WIS | 247 F. 968 | Enemy alien. |
| Thomas | 1/3/18 | DC ED WIS | 247 F. 968 | Enemy alien. |
| Grahl | 10/7/19 | CCA 7th | 261 F. 487 | Enemy alien. |
| Harbanuk | 1/9/33 | CCA 2nd | 62 F.2d 759 | Not within class of aliens entitled to citizenship by virtue of military service. |

## V.

Violation in Apparent *Good* Faith of Status or Procedural Matters Not Otherwise Classified:

(a) Amounts to Fraud and/or Illegal Procurement Without Distinction:

| | | | | |
|---|---|---|---|---|
| Nopoulos | 9/15/15 | DC SD IOWA | 225 F. 656 | Did not file declaration of intention before petition. |
| Vujnovic | 10/9/35 | DC WD NY | 12 F.Supp. 208 | No certificate of arrival filed with petition for naturalization. |
| Kazarian | 8/2/39 | DC MONT | 34 F.Supp. 260 | Not resident of county of naturalization court. |

(b) Amounts to Fraud Alone:

| | | | | |
|---|---|---|---|---|
| Stranack | 2/18/25 | DC WD WASH | 6 F.2d 334 | No certificate of arrival. |
| Rosenberg | 7/19/32 | CCA 3rd | 60 F.2d 475 | Not resident of state where court granted naturalization. |

(c) Amounts to Illegal Procurement Alone:

| | | | | |
|---|---|---|---|---|
| Schurr | 8/4/08 | DC WD MICH | 163 F. 648 | Admitted by Court other than that of residence. |
| Wayer | 8/7/08 | DC WD MICH | 163 F. 650 | Admitted by Court other than that of residence. |
| Van Der Molen | 8/10/08 | DC WD MICH | 163 F. 650 | Admitted by Court other than that of residence. |
| Nisbet | 3/31/09 | DC WD WASH | 168 F. 1005 | Evidence taken out of Court's presence. |
| Meyer | 5/27/09 | DC ED WASH | 170 F. 983 | No declaration of intention. |
| Plaistow | 8/2/10 | DC WD NY | 189 F. 1006 | Certificate granted when alien had not served full term in the Marines. |
| Leles | 11/1/15 | DC ND CAL | 227 F. 189 | Witnesses' testimony not in open court. |
| Gulliksen | 6/9/17 | CCA 8th | 244 F. 727 | Use of ineligible witness. |
| Mueller | 10/29/17 | CCA 8th | 246 F. 679 | Petition filed more than 7 years after declaration of intention. |
| Ness | 12/10/17 | US SC | 245 U.S. 319, 38 S.Ct. 118 | Did not file certificate of arrival. |
| Milder | 10/21/22 | CCA 8th | 284 F. 571 | Court denied Government right to introduce evidence. |
| Koopmans | 5/14/23 | DC ED NY | 290 F. 545 | Not resident of proper district at time of filing declaration of intention. |
| Olaechea | 10/8/23 | DC NEV | 293 F. 819 | Did not appear before appropriate naturalization official. |
| Lecka | 3/17/24 | DC TENN | 7 F.2d 380 | Filed petition more than 7 years after declaration of intention. |
| Ovens | 6/8/26 | CCA 4th | 13 F.2d 376 | Application for citizenship filed too long after declaration of intention. |
| Maney | 6/16/27 | CCA 7th | 21 F.2d 28 | Certificate of arrival not presented with petition for naturalization. |
| Manzi | 4/9/28 | US SC | 276 U.S. 463, 48 S.Ct. 328 | Petition filed more than 7 years after declaration of intention. |
| Maney | 10/22/28 | US SC | 278 U.S. 17, 49 S.Ct. 15 | Did not secure certificate of arrival before obtaining citizenship. |

(d) *Does Not* Amount to Fraud or Illegal Procurement:

| Andersen | 4/1/09 | DC IDAHO | 169 F. 201 | Admitted by Court other than that of residence. |
|---|---|---|---|---|
| Erickson | 9/28/10 | DC WD MICH | 188 F. 747 | No declaration of intention. |
| Ness | 10/17/14 | DC ND IOWA | 217 F. 169 | No certificate of arrival. |
| Salomon | 5/20/16 | CCA 5th | 231 F. 928 | Certificate granted same day petition filed. |
| Hodgman | 3/27/15 | DC MONT | 221 F. 1018 | Canadian naturalization granted to defendant after had made declaration of intention to become U. S. Citizen. |
| Butikofer | 1/13/16 | DC IDAHO | 228 F. 918 | Lacked 2 months of attaining majority. |
| Richmond | 1/13/27 | CCA 3rd | 17 F.2d 28 | Judge left room during naturalization. |
| Patterson | 9/18/33 | DC MONT | 4 F.Supp. 693 | Stated intent to return to Nova Scotia. |
| Bukis | 12/3/36 | DC ED PA | 17 F.Supp. 77 | Lutheran church record insufficient evidence of place of birth. |

(e) *Does Not* Amount to Fraud Alone:

| Tedesco | 1/15/40 | DC SD NY | 31 F.Supp. 322 | Crimes committed 8 years after naturalization. |
|---|---|---|---|---|
| Der Manelian | 5/13/41 | DC RI | 39 F.Supp. 959 | Defendant falsely stated in Petition that he had children. |
| Grabina | 5/19/41 | CCA 2nd | 119 F.2d 863 | False name. |

(f) *Does Not* Amount to Illegal Procurement Alone:

| Nechman | 5/12/10 | DC ED MICH | 183 F. 788 | Did not make declaration of intention. |
|---|---|---|---|---|
| Lenore | 10/1/13 | DC N DAK | 207 F. 865 | Petition for naturalization signed by mark only. |
| Lengyel | 2/10/15 | DC WD PA | 220 F. 720 | Delay in applying for citizenship. |
| Morris | 2/10/15 | DC WD PA | 220 F. 720 | Delay in applying for citizenship. |
| Glantz | 2/10/15 | DC WD PA | 220 F. 720 | Delay in applying for citizenship. |
| Viaropulos | 3/13/15 | DC WD PA | 221 F. 485 | Clerical error in declaration of intention. |
| Orend | 3/13/15 | DC WD PA | 221 F. 777 | Clerical error in declaration of intention. |
| Salomon | 1/29/16 | DC ED LA | 231 F. 461 | Failed to post application for citizenship within 90 days. |
| Ness | 2/16/16 | CCA 8th | 230 F. 950 | No certificate of arrival. |
| Hirschhorn | 10/4/27 | DC SD NY | 21 F.2d 758 | Declaration of intention filed in county other than that of applicant's residence. |
| Bialoglowski | 12/20/37 | DC SD CAL | 21 F.Supp. 613 | Immigration visa different from certificate of arrival. |

## VI.

Violation (in Apparent *Bad Faith*) of Status or Procedural Matters Not Otherwise Classified:

(a) Amounts to Fraud *and/or* Illegal Procurement Without Distinction:

| | | | | |
|---|---|---|---|---|
| Olsson | 5/11/12 | DC WD WASH | 196 F. 562 | Entertained beliefs of common ownership of property. |
| Sourino | 11/17/36 | CCA 5th | 86 F.2d 309 | Falsely stated marital status to naturalization court. |
| Zaltzman | 4/27/37 | DC WD NY | 19 F.Supp. 305 | Failure to state name of undivorced wife. |
| Marino | 4/3/39 | DC SD NY | 27 F.Supp. 155 | False statement in petition as to former residence. |
| Goldstein | 12/15/39 | DC ED NY | 30 F.Supp. 771 | Never established lawful residence since entered country on cousin's passport. |

(b) Amounts to Fraud Alone:

| | | | | |
|---|---|---|---|---|
| Albertini | 5/28/13 | DC MONT | 206 F. 133 | Falsely stated he was single. |
| Glaser | 4/18/23 | CCA 7th | 289 F. 255 | Deceived court with respect to belief in organized Government. |
| Etheridge | 5/3/30 | DC OR | 41 F.2d 762 | Misstated date of entry into U. S. |
| Saracino | 9/8/30 | CCA 3rd | 43 F.2d 76 | Concealed from naturalization examiner prior arrest for assault and battery with intent to kill. |

(c) Amounts to Illegal Procurement Alone:

| | | | | |
|---|---|---|---|---|
| Parisi | 8/11/38 | DC MD | 24 F.Supp. 414 | Did not disclose to naturalization examiner first entry into U. S. was unlawful. |

(d) *Does Not* Amount to Fraud or Illegal Procurement:

| | | | | |
|---|---|---|---|---|
| Siem | 6/30/24 | CCA 9th | 299 F. 582 | Claimed military exemption because of alienage. |
| Marini | 11/4/36 | DC SD NY | 16 F.Supp. 963 | Forgery of Immigration papers. |

(e) *Does Not* Amount to Fraud Alone:

No cases

(f) *Does Not* Amount to Illegal Procurement Alone:

| | | | | |
|---|---|---|---|---|
| Bialoglowski | 2/23/39 | CCA 9th | 101 F.2d 928 | Conflict in contents in certificate of arrival and immigration visa. |

## VII.

Mental Reservation of Allegiance to Foreign Nation:

(a) Amounts to Fraud and/or Illegal Procurement Without Distinction:

| | | | | |
|---|---|---|---|---|
| Wursterbarth | 5/13/18 | DC NJ | 249 F. 908 | Pro-German statements during World War 1. |
| Schurmann | 5/3/20 | CCA 9th | 264 F. 917 | Wrote Pro-German book. |

(b) Amounts to Fraud Alone:

| | | | | |
|---|---|---|---|---|
| Darmer | 5/10/18 | DC WD WASH | 249 F. 989 | Refused to buy Liberty Bonds. |
| Kramer | 12/23/19 | CCA 5 | 262 F. 395 | Spy information for Germany. |
| Herberger | 4/2/21 | DC WD WASH | 272 F. 278 | Wrote unpatriotic letter to sister. |

(c) *Does Not* Amount to Fraud:

| | | | | |
|---|---|---|---|---|
| Woerndle | 4/2/23 | CCA 9th | 288 F. 47 | To criticize enemies of Germany before U. S. entered war. |

## VIII.

Mental Reservation is Lack of Attachment (Miscellaneous):

| | | | | |
|---|---|---|---|---|
| Stuppiello | 9/10/19 | DC WD NY | 260 F. 483 | Amounts to fraud to reserve belief in anarchy. |
| Olsen | 4/26/21 | DC WD WASH | 272 F. 706 | Being a member of and attached to principles of I.W.W. amounts to illegal procurement. |
| Swelgin | 5/22/18 | DC OR | 254 F. 884 | Member of I.W.W. during 5 year period preceding citizenship sufficient to show lack of attachment and amounts to fraud. |
| Tapolcsanyi | 4/17/30 | CCA 3rd | 40 F.2d 255 | Fraud to entertain belief in communism during preceding 5 years. |

Is Not Fraud or Illegal Procurement:

| | | | | |
|---|---|---|---|---|
| Siem | 6/30/24 | CCA 9th | 299 F. 582 | Exemption claimed from Selective Service Act on ground of alienage. |
| Rowan | 3/28/27 | CCA 9th | 18 F.2d 246 | Being member of I.W.W. and instigating strikes in war time 10 years after naturalization not evidence of fraud. |

In view of the confusion, any effort to find the law applicable to the questions involved, so far as Section 15 is concerned, makes it necessary "to begin at the beginning" by examining the test of the Statute. Browder v. United States, 1940, 312 U.S. 335–338, 61 S.Ct. 599, 85 L.Ed. 862, is authority for the proposition that no single argument has more weight in statutory construction than the plain meaning of the words of the Act.

The Text of the Law.

Disregarding, for the moment, the holdings and decisions of the various courts under Section 15, and examining it solely from the viewpoint of its text (heretofore quoted), it seems to me that there should be no confusing results. It is couched in plain and simple terms.

In reading it, nothing mysterious, technical, or difficult makes itself apparent in the language.

In fact the language seems clearly to express the intent of Congress to do several things: First, to grant specific power and authority to designated officers of the Government, viz., the U. S. Attorneys, to commence suits to cancel citizenship; second, to confer jurisdiction on specific courts to hear and determine such suits; and third, to clearly state *two different grounds* upon which such suits will lie, (a) fraud, *or* (b) illegal procurement.

█ The word *"fraud"* as used in the Section relates to the grounds for setting aside an order of a Court—a *judgment*. As so used the word "fraud" had a well understood, a common and accepted meaning in 1906. It had been clearly defined many times and the question was re-examined and stated again without change in *1878* in the Throckmorton case, infra, which definition has been and still is regarded as the classic statement of the min-

imums required to constitute that fraud which will vitiate a judgment, as well as a statement of the minimums which must be pleaded in order for a complaint to state a cause of action to set aside a judgment for fraud.

In United States v. Throckmorton, 1878, 98 U.S. 61, 65, 25 L.Ed. 93, the Court said:

"If the court has been mistaken in the law, there is a remedy by writ of error. If the jury has been mistaken in the facts, the remedy is by motion for new trial. If there has been evidence discovered since the trial, a motion for a new trial will give appropriate relief. But all these are parts of the same proceeding, relief is given in the same suit, and the party is not vexed by another suit for the same matter. So in a suit in chancery, on proper showing a re-hearing is granted. If the injury complained of is an erroneous decision, an appeal to a higher court gives opportunity to correct the error. If new evidence is discovered after the decree has become final, a bill of review on that ground may be filed within the rules prescribed by law on that subject. Here, again, these proceedings are all part of the same suit, and the rule framed for the repose of society is not violated.

"But there is an admitted exception to this general rule in cases where, by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case.

"Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumed to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing. See Wells, Res Adjudicata, sec. 499; Pearce v. Olney, 20 Conn. 544; Wierich v. De Zoya, 7 Ill. 385; Kent v. Ricards, 3 Md. Ch. 392; Smith v. Lowry, 1 Johns. Ch., N.Y., 320; De Louis et al. v. Meek et al., 2 [G. Greene], Iowa, 55.

"In all these cases, and many others which have been examined, relief has been granted, on the ground that, by some fraud practiced directly upon the party seeking relief against the judgment or decree, that party has been prevented from presenting all of his case to the court.

"On the other hand, the doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudulent instrument, or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed. Mr. Wells, in his very useful work on Res Adjudicata, says, sec. 499: 'Fraud vitiates everything, and a judgment equally with a contract; that is, a judgment obtained directly by fraud, and not merely a judgment founded on a fraudulent instrument; for, in general, the court will not go again into the merits of an action for the purpose of detecting and annulling the fraud.' * * * 'Likewise, there are few exceptions to the rule that equity will not go behind the judgment to interpose in the cause itself, but only when there was *some hindrance* besides the negligence of the defendant in presenting the defence in the legal action.'[7] * * *

" 'The maxim that fraud vitiates every proceeding must be taken, like other general maxims, to apply to cases where proof of fraud is admissible. *But where the same matter has been actually tried, or so in issue that it might have been tried, it is not again admissible; the party is estopped to set up such fraud, because the judgment is the highest evidence, and cannot be contradicted.*' It is otherwise, he says, with a stranger to the judgment. This is said in a case where the bill was brought for the purpose of impeaching the decree directly, and not where it was offered in evidence collaterally. *We think these decisions establish the doctrine on which we decide the present case; namely, that the acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered.*

---

[7] Underscoring supplied here, as elsewhere throughout this memo, unless otherwise noted.

"That the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, *would be greater,* by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases."

The C.C.A. of the 2nd Circuit in the Gleeson case, United States v. Gleeson, 1898, 90 F. 778, had explicitly held that the doctrine of the Throckmorton case, supra, applied when alleging fraud in a denaturalization case. The Circuit Court of the Eastern District of Missouri in the Norsch case, United States v. Norsch, 1890, 42 F. 417; had previously held to the same effect.

While an Act of Congress was not needed to create fraud as a ground for vitiating judgments, it did require an Act of Congress to vest the power in a particular official to bring suit, and to vest jurisdiction in the courts specified to cancel the judgment of another court for fraud.

Abstractly, fraud is one of those words which it is difficult, if not impossible, to define, because no one can contemplate the ingenuity or cunning of the human mind. It is a comprehensive term.

■ The smallest varient of purpose, coupled with an otherwise legitimate act, may change a good deed or situation to an evil one. But there must be some "outward state of a man"—some objective thing—some act done, which reflects this inward purpose of fraud. Howsoever evil or wicked one's purpose might be, so long as it is kept within that incontestable realm of one's own mind it is not fraud. It is the result accomplished or attempted which makes an act a fraudulent one. If coupled with intent, the fraud is actual; if the same bad result is achieved without intent, then the fraud is constructive; if it is apparent on the face of the judicial record it is patent; if fraud existed but is not apparent, it is latent; and whether latent or patent it may be either intrinsic or extrinsic. It is intrinsic if it was in issue or if the facts, or the acts, or the words, or the intent was not a matter in the nature of procedure, but a matter actually or of necessity in issue, i.e., if that was one of the things which the trial was about. It is extrinsic if it defeated the jurisdiction of the Court by "meeting and artfully disarming the prudence" of the adversary or the Judge. In short, fraud as the word was used in the Act as being a ground for vitiating judgments, was the traditional fraud as the term was known. It included either actual or constructive fraud, whether patent or latent, so long as it was extrinsic. There is not one word in the whole Act of 1906 which indicates that Congress intended the word "fraud" in Section 15 to mean anything different than extrinsic fraud, nor to change the procedure or the requirements of pleadings with relation to it.

*"Illegal procurement"* was the new thing *introduced in the law.* On the ground of fraud *or* on the ground such order and certificate were "illegally procured" runs the Statute.

Obviously, the term "illegal procurement" meant to convey something *different* than fraud; something which would give a wider scope than fraud to this new weapon of cancellation; something less than actual fraud, because that was difficult of proof, something more inclusive than constructive fraud because that relates only to the actual proceedings in court, such as the failure to abide the law in the service of process, etc., whereas they were creating a procedure which was partly before a Court and partly before an executive or administrative department of the Government. And constructive fraud, as a ground for vitiating judgments was a term well understood to mean just that thing—the failure to abide some procedure or rule of court, failure to serve the summons, the notice of trial, or service improperly, suit in the wrong county, and the like, regardless of the intent or even knowledge of the plaintiff.

Now, Section 15 was a part of the whole act, which contained a complete scheme and system for naturalization.

Section 4 of the Act, 34 Stat. 596, provides that citizenship could be procured, *"in the following manner and not otherwise."*

That and succeeding sections then outlined numerous requirements and prohibitions, which may roughly be divided into three classes, viz., *procedure, status, and attitudes.*

Whether or not the petitioner followed the requirements and prohibitions as to *procedure* appears from the face of the record; such as whether or not the oath was taken before the Clerk of the court,

or the appropriate time passed between the filing of the Petition and the final proceedings, or the correct forms were used or two witnesses were used when required and the like.

But as to *status* and *attitudes,* the Act permits, on the one hand, some things *within each class* to be established by the *naked statement of the petitioner,* and requires, on the other hand, that some things in each class shall be established by the testimony of "two *credible witnesses,* citizens of the United States."

To illustraate as to *status:* the Act requires that the petitioner disclose among other things whether or not he is a "white person," whether or not he is or has been married, his occupation, his residence, his birthplace and date, whether or not he is an ex-convict and where he has lived during the previous five years; as to the latter (his residence during the previous five years) he must have the testimony of the two witnesses, but as to all the other requirements concerning status, the bare word of the petitioner is accepted.

To illustrate as to *attitudes:* Both negative and positive attitudes are required. On the negative side the Act prohibits the naturalization of any one who believes in or advocates or practices anarchy, political assassination, overthrow of the Government by force and violence, or polygamy; *on the positive side* the Act prescribes qualifications as to good moral character, attachment to the principles of the Constitution of the United States[8] and intentions of permanent residence: The *bare word* of the petitioner is all that is required by the Act to establish the petitioner's attitude on those things which are specifically prohibited, viz., anarchy, polygamy, political assassination and overthrow of the Government by force and violence, as well as the petitioner's intention to reside permanently in the United States. *Two witnesses,* however, are required to prove the attitudes which the petitioner must affirmatively possess, viz., his good moral character and attachment to the principles of the Constitution which are not specifically defined in the Act and cannot be compressed into a definitive word or phrase. As to these the requirement of proof is more exacting. The petitioner's attitude as to them cannot be established by his own statements and representations,

but must be proved by the testimony of at least two witnesses who must have certain qualifications, viz., they must be "credible" and they must be "citizens" of the United States and they must in fact have known the petitioner for the requisite period, and the measure of their testimony is not their opinion on those matters, but testimony of his "behavior"—his conduct—for each place of residence during the previous five continuous years.

If compliance with the statute is thus had as to the manner and time of proceeding, if on the face of the proceedings the petitioner is eligible and qualified, if the witnesses are in fact qualified, and in fact have known the petitioner for the requisite period, and if those things which depend upon the petitioner's naked assertion for their establishment are true, then the law is followed by the petitioner, that is, the proceedings are "legal", and citizenship is "legally" procured. If not, then the citizenship is "illegally procured."

By these requirements and prohibitions, Congress enlarged the things upon which a judgment of admission would *not be res judicata* by placing them in a category similar to the preliminary jurisdictional requirements in an ordinary law suit. The only difference being that in this Act Congress, having thus enlarged the field of preliminary requirements, designated noncompliance with them as "illegal procurement" instead of leaving them to the courts to be classified or not as "constructive fraud."

A familiar illustration will serve the point; in an ordinary law suit where a default trial is had, it is necessary to the jurisdiction of the court, not only that the record show proper service of the summons by a qualified person, but it is also necessary that the statement contained in the affidavit of service be true, all as required by the specific commands of the law; no inquiry in such a default trial is made by the court into such things, and no evidence is adduced as to them, but the act of the plaintiff in proceeding with the case is accepted as assurance of "legal" service of the summons. However, if the statements in the affidavit of service are not true, that is if (as required by California law) the summons was not served by a person over the age of 18 years, or was not delivered to and left with the

---

[8] "well disposed to the good order and happiness of the United States" is **not** a separate qualification but appears to be part of the "attachment" requirement.

defendant personally, or was not served upon the proper officer of a corporation, or if it should happen on subsequent examination that these things appeared on the face of the record to have been improperly done, then a suit will lie to set aside the judgment on the ground that they were not "legally" done, regardless of whether or not there was any actual fraud on the part of the plaintiff, or any knowledge of their truth or falsity. Such a judgment would be "illegally procured" although called "constructive fraud."

These are, and in 1906 were, familiar principles of law.

There was nothing that prevented Congress from enlarging the field of preliminary requirements in a naturalization suit, any more than there is to prevent the legislature from changing the manner or method of service of summons where a plaintiff seeks the process of the law to adjudicate his rights as against another person or the State.

■ Applying the analogy to a naturalization proceeding, it is apparent that a judgment of naturalization to be "legally procured" must (1) *show on the face of the proceedings as to matters of procedure;* that the petitioner not only has not omitted any of the steps required, but that all of them have been taken in the manner and at the time and places specified, and that the requisite number of witnesses were used when more than one is required; (2) *and must show on the face of the proceedings as to* matters of *status and attitudes;* that the petitioner is not possessed of any status or attitude which is prohibited, and is possessed of the status and attitudes which are required. To be "legally procured," it is also required that *back of the face of the record* the witnesses must be qualified in fact, and likewise matters which depend for their establishment and proof upon the assertions and representations of the petitioner alone, must be true, whether appertaining to procedure, or status or attitude.

Lacking these things, either in procedure or in fact the naturalization proceedings would not be "legal," that is they would be "illegal," and the citizenship would be "illegally procured," regardless of whether there was any actual fraud on the part of the petitioner or not, or even knowledge of the truth or falsity of any statement.

The law gives a different effect to the facts established solely by the representations of the petitioner than it does to the facts which it requires to be established by the testimony of two qualified witnesses.

■ Falsity or non-existence of the facts established solely *by the representations of the petitioner* permits cancellation on the ground of "illegal procurement," but falsity or non-existence of the facts established by the testimony of two qualified witnesses will permit cancellation only on the ground of fraud—extrinsic fraud.

Further discussion of the text of the law will be had when considering the question of res judicata.

### History.

The history and circumstances surrounding the origin of this Section of the Statute are revealing.

The revision of the Naturalization Laws in 1906, 34 Stat. 596, was the first general overhauling of the Statutes on that subject which had occurred in 100 years.

The Constitution committed to Congress the power to pass laws for a uniform rule on naturalization. But Congress, in the use of that power had exercised a very limited authority. It had prescribed a very loose procedure, and designated only the Courts which had power to *grant* judgments of naturalization. No courts were vested with jurisdiction to cancel citizenship judgments. The subject of cancellation simply was not mentioned, and I am unable to find any record of the consideration of the subject by Congress before 1906.

The loose procedure induced not only carelessness, but venality, so that from time to time scandals arose in connection with naturalization. President Grant made these scandals a topic in three of his annual messages to Congress (Dec. 7, 1874, Dec. 7, 1875, and Dec. 5, 1876).

It was likewise only natural that the scandals would induce efforts to correct them, even though no action was taken by Congress until 1906. These efforts took the form of suits to cancel citizenship (the first of which seems to have been filed by private citizens in 1868),[9] but with various and inconclusive results, inasmuch as there was no special law on the subject.

Under designation by Congress as Naturalization Courts, many courts, such as

---

[9] Commonwealth v. Moses Paper, 1 Brews., Pa., 263.

Probate Courts, City Courts and the like had power to naturalize citizens, but were wholly without any equity powers to set aside one of their own judgments where it had been obtained by extrinsic fraud, which had always been recognized as a ground for setting aside a judgment. Thus, while there was a recognized ground for a judgment of cancellation, the matter of what court had jurisdiction, so far as the State Courts were concerned was subject to a vast and contradictory multitude of various state laws.

So far as the Federal Courts were concerned, it had been held in the Circuit Court of Appeals for the 2nd Circuit in the Gleeson case, supra, that notwithstanding the absence of a specific statute conferring jurisdiction so to do, the Federal Courts had jurisdiction to set aside a naturalization judgment of a State Court on the ground of extrinsic fraud as defined in the Throckmorton case, supra (but not on the ground of *intrinsic* fraud.) To the same effect was the Norsch case, 1890, 42 F. 417; which went further and held that Federal Courts had no jurisdiction to set aside such State Court judgments on any other ground than fraud—such as failure to comply with the preliminary requirements concerning the manner and method of procedure and the like. But in neither of those cases, nor in any other so far as I can find, had the question been decided whether or not such a suit would properly lie in the district where the defendant was naturalized, or in the district where the defendant was living at the time the suit for cancellation was brought.

The law was equally unsettled as to who was the proper party plaintiff in a suit to cancel. In Pintsch Compressing Co. v. Bergin, C.C.D.Mass.1897, 84 F. 140; In re McCarren, 8 Misc. 482, 29 N.Y.S. 582, 23 L.R.A. 835; and Commonwealth of Pa. v. Moses Paper, 1868, 1 Brews., Pa., 263, it was held that a private citizen could not bring such a suit. In the latter case the court held that the State Attorney General had the power to bring the suit, and denied the petition of ten citizens asking to set aside judgments of naturalization for about 50 people granted by that court a few days before, where no declaration of intentions had been filed, only one witness vouched for each of them, and in some cases one alien vouched for another alien. On the other hand, in Petersen v. State, 1905, 40 Tex.Civ.App. 175, 89 S.W. 81, the Texas Civil Court of Appeals held that the State was not properly a party to a suit to cancel citizenship. In the Norsch case, supra, it was assumed by the District Court for the Eastern District of Missouri in 1890, but neither discussed nor decided that the United States Attorney General had the right to bring the suit.[10] In the Kornmehl case, United States v. Kornmehl, D.C.N.J., 1898, 89 F. 10, a similar assumption was made, but the U. S. Attorney within a short while after a judgment of naturalization, and while the papers "[were] still within the control of the court" moved to cancel.

In the midst of this uncertainty in the law as to who could sue, where the suit should be brought, what court had jurisdiction, and what ground would support a judgment, the St. Louis vote frauds were precipitated.

It appears that ward heelers, previous to election would gather large groups of foreigners together and sometimes in the night would herd them into court, without previous formality, or any kind of investigation into their qualifications. They would then be sworn in as citizens of the United States in a language which they neither spoke nor understood and certificates issued. Some clerks were engaged in a regular brokerage business in certificates of naturalization which were sometimes sold to aliens residing abroad, who had never even been in the United States. Sometimes sham and spurious certificates were issued with forged names on them.[11]

These scandals led to prosecutions and convictions, which in turn led to investigations in other cities, vigorous denunciation of the situation by President Roosevelt (Theodore) to Congress (Third Annual Message Dec. 7, 1903) the appointment of a committee by Elihu Root, Secretary of State, the compilation of a comprehensive report to Congress[12] reviewing the general facts as well as the legal complexity upon the subject.

The result was an act which provided not

---

[10] The court sustained a demurrer to a petition to cancel on other grounds.

[11] For a recitation of these frauds, see United States v. Lenore, D.C., 207 F. 865; and Dolan v. United States, 8 Cir., 133 F. 440.

[12] House Document 326, 59th Congress, being a letter from Elihu Root, Secretary of State and a report.

222

only for a more orderly system of naturalization, *but also for the specific authority to denaturalize,* by setting forth in Section 15, *who* could bring the suit—the U. S. District Attorney; *what courts* had jurisdiction—all courts of naturalization; where the suit must be brought—where the defendant was residing at the time the cancellation suit was commenced; and the *grounds* of cancellation—fraud *or* illegal procurement.

The existing ground, fraud—extrinsic fraud—was not to be excluded by not being designated. And a new ground was added—illegal procurement—a ground with greater sweep than fraud, and which was necessary to effectively complement the additional requirements as to procedure and qualifications contained in the new Act of 1906.

The House Committee on Immigration and Naturalization (H. R. 1789, 59th Congress) recommending the passage of the Bill said:

"It is the opinion of your committee that the frauds and crimes which have been committed in regard to naturalization have resulted *more from the lack of any uniform system of procedure in such matters than from any radical defect in the fundamental principles of existing law governing in such cases.*" (Italics supplied.)

The "system of procedure" being largely responsible for the difficulties, it was only logical that a simpler ground than fraud—illegal procurement—should be prescribed to cancel citizenship where the "system of procedure" was not followed:

In the Tutun case, Tutun v. United States, 1926, 270 U.S. 568, 46 S.Ct. 425, 428, 70 L.Ed. 738, the Supreme Court said:

"The act of 1906 did not introduce any change in policy. It did change, in some respects, the qualifications. And to carry out the established policy through *more effective application of the law, it made changes in administrative and judicial machinery.*" (Italics supplied.)

The historical background and circumstances surrounding the passage of the bill, the "extrinsic tokens of intention",[13] thus point to the same conclusion of meaning and intent as the text of the law.[14]

### The Cases.

Coming now to a consideration of the cases decided since 1906.

Reconciliation of the decisions of the various courts, even before the present war, is impossible as heretofore shown. But in spite of the lack of agreement in the lower and intermediate courts, a careful consideration of the cases heard and decided by the Supreme Court since 1906 discloses a pattern of decision laid down by it which makes the distinction clear between fraud and illegality. It is to the effect that the directions and prohibitions of the Statute

---

[13] Moore Ice Cream Co. v. Rose, 1933, 289 U.S. 373, 53 S.Ct. 620, 622, 77 L.Ed. 1265.

[14] An interesting comment as to the finality of a judgment of naturalization was made in the House of Representatives on May 6th, 1858, by Hon. Wm. Smith of Virginia, on the question then before the House as to the admission of Minnesota into the Union, and the provisions in its proposed constitution concerning alien suffrage:

Mr. William Smith of Virginia, said: "What is requisite to give a foreigner the right of suffrage? He must make his declaration; he must be five years in the country, and that must be proved by two citizens of the United States; he must show himself to be a man of probity and good demeanor, and to have borne an unquestionable character; he must show that he is acquainted with our institutions, and attached to the principles of our Government. Suppose that the foreigner should ask to be naturalized, and should fail in any of these requisites, can he acquire the right to citizenship?

Suppose that he turns out to be a man of bad character; suppose it is notorious that he is anything but friendly to our free institutions; suppose, instead of showing he is attached to the principles of our Government, that it is shown that he is still a monarchist: he cannot acquire the rights of naturalization; and thus it is, sir, *he may be rejected in the very last moment,* after having been five years in the country, and when he appears in court to perfect his right to citizenship. *Congress then, does not lose* its hold on him until *the last hour;* and, until he becomes an American citizen, the State has no power to confer upon him the rights of suffrage in any Federal election. I think that this is one of those propositions which cannot be controverted; and I think that, as Congress controls him until all the conditions required by the naturalization laws are fully complied with, it is conclusive evidence that the State has no power to confer upon him any political right under the Federal Constitution whatever."

as to eligibility, mode, manner, time requirements, steps of procedure, qualifications of witnesses and status and attitudes established other than by the testimony of two witnesses, are preliminary jurisdictional prerequisites, which, if not abided, will sustain cancellation on the ground of "illegal procurement," but not on the ground of fraud.

This is perhaps best illustrated by the Schwinn case, 9 Cir., May 10, 1940, 112 F. 2d 74, arising in this District in 1940. Cancellation was granted in the District Court on the ground that the certificate was procured *"fraudulently* and *illegally"* in that, the witnesses as to petitioner's residence, moral character and attachment falsely swore that they knew the applicant for five years. On appeal to the Circuit Court the Government presented *only the ground of fraud* and the Circuit Court sustained cancellation only on that ground and did not "make any expression as to" the ground of illegal procurement. On appeal to the Supreme Court the judgment was affirmed *"on the sole ground that the certificate of citizenship was illegally procured"* 311 U. S. 616, 61 S.Ct. 70, 85 L.Ed. 390. The effect of that holding is that the witnesses were not qualified in fact in that they did not in fact know the behavior of the defendant for five years.

The Schwinn case destroyed whatever authority, if any, the Johannessen, 1912, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066, and Mansour cases, D.C.S.D.N.Y., 1908, 170 F. 671; Id., D.C.S.D.N.Y., 1909, 170 F. 676, certiorari denied 1912, 226 U.S. 604, 33 S.Ct. 217, 57 L.Ed. 378, were to the contrary. In them, like the Schwinn case, witnesses gave perjured testimony as to the previous five years residence of the applicant which the courts held was fraud. By the Schwinn case such false swearing is definitely *"illegal procurement"*, and not fraud under Section 15. The "illegality" lay in the lack of statutory qualification of the witnesses, not in the lack of "attachment" or good moral character by the alien.

The Ginsberg case, 1917, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853, established the proposition that where it was shown without dispute at the hearing of the petition for naturalization, that the applicant was not qualified by the prescribed term of five years residence, the certificate was "illegally procured." It also fixed the proposition that a hearing held in chambers, rather than in open court was noncompliance with the procedural requirements of the law and would support a judgment for, "illegal procurement."

The Ness case, 1917, 245 U.S. 319, 38 S.Ct. 118, 119, 62 L.Ed. 321, establishes the proposition that the absence of the certificate of arrival stating the date, place, and manner of arrival as provided in Section 4 of the Act would support a judgment for cancellation on the ground that the certificate was "illegally procured." The court said that the filing of such certificate was "an essential prerequisite to the valid order of naturalization."

In the Third case, 1923, 261 U.S. 204, 43 S.Ct. 338, 67 L.Ed. 616, it was held that a certificate was subject to cancellation as having been illegally procured in that the applicant was a Hindu and, as such, one of the class of persons stated by the law to be ineligible for citizenship. So, with the Toyota case, 1925, 268 U.S. 402, 45 S.Ct. 563, 69 L.Ed. 1016, where the applicant was a Japanese.[15]

In the Maney case, 1928, 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156, a certificate was cancelled on the ground that it was illegally procured because of conditions somewhat similar to the Ness case. The certificate of arrival was not filed *at the time* of filing the petition for naturalization but was furnished later and ordered filed nunc pro tunc. The court said that this was a "condition precedent to the authority of the Court to grant a petition" and that granting it without compliance was *"illegal in the sense that it is unauthorized by and contrary to the law.* * * * *the filing with the petition of the certificate of arrival was a condition attached to the power of the Court.* * * * and, "must be complied with strictly." The Court also said, "But as it has been decided that no valid decree could be made until the certificate was filed and as the hearing took

---

[15] Pandit v. United States, 9 Cir., 1926, 15 F.2d 285, involved a denaturalization proceeding against a Hindu, on the ground he was an ineligible person. The District Court sustained the defense of both laches and res judicata. The Circuit Court sustained only the defense of res judicata without discussion or decision on laches. It distinguished both the Ozawa case, Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67 L.Ed. 199, and the Third case, 261 U.S. 204, 43 S. Ct. 338, 67 L.Ed. 616, on the ground that the question of res judicata was not raised.

place and the decree was entered in less than ninety days from the time when the certificate was received the want of power seems to us doubly plain" as being in violation of Sec. 6 of the Naturalization law of that time, 34 Stat. 598, 8 U.S.C.A. 396. Then as if to point up the proposition that these were procedural requirements and were jurisdictional, the Court says: "If after the certificate came the petition had been refiled, a new notice had been given and ninety days had been allowed to elapse before the hearing there would be a different case."

In the Manzi case, 1928, 276 U.S. 463, 48 S.Ct. 328, 72 L.Ed. 654, a certificate was held to have been illegally procured where the widow of the declarant attempted under Section 6 to secure her citizenship more than seven years after the declaration of intention made by her deceased husband.

The Ozawa case, 1922, 260 U.S. 178, 43 S.Ct. 65, 66, 67 L.Ed. 199, went up on a certificate from the 9th Circuit. It was not a Sec. 15 case but an appeal from an order of the U. S. District Court for the Territory of Hawaii, denying a petition to be admitted a citizen of the United States. As to the Act of 1906, the Court said:

"The act of June 29, 1906, entitled 'An act to establish a Bureau of Immigration and Naturalization, and to provide for a uniform rule for the naturalization of aliens throughout the United States', consists of 31 sections and deals primarily with the subject of procedure. * * *". (Italics supplied.)

There is one other Supreme Court case decided before the Schneiderman case, supra, under Section 15. It is the Luria case, 1913, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101,[16] decided in 1913. It was the only case which concerned false swearing as to a state of mind—intent—and is not in discord with the holdings of the other cases hereinbefore reviewed, because the Luria case arose under a special provision of Section 15. The 1906 Act, among other things, in Section 4, for the first time required a statement in the Declaration of Intention, as well as in the petition for citizenship, that the applicant intended to reside permanently in the United States. Theretofore, the only thing concerning the state of mind of the applicant which had been dealt with in the law since 1789 had been attachment and allegiance. This was

an additional requirement concerning the "inward state" of the applicant—intent—as to residence, purely a matter within the uncertain and mercurial realm of the mind, the existence of which a petitioner could not demonstrate by his "behavior." This was regarded by the Committee in charge of the Bill as a fundamental change. The report of the House Committee on Immigration and Naturalization recommending the passage of the law, among other things said:

" 'The two changes which the committee has recommended in the principles controlling in naturalization matters and which are embodied in the bill submitted herewith are as follows * * * Second. That the alien must intend to reside permanently in the United States before he shall be entitled to naturalization.' House Report No. 1789, 59th Cong., 1st Sess. p. 3." (Italics supplied) See Ozawa case, 260 U.S. 178, at page 191, 43 S.Ct. 65, at page 66, 67 L.Ed. 199.

Now the existence of the state of mind—an intent at a particular time is known to everyone always to be difficult of proof, especially when that intent must be ascertained from subsequent acts. The non-existence or lack of such specific intent, that is to prove something was not in one's mind, is much more difficult.

In Section 15 we find Congress, as if in recognition of the great difficulty to prove the absence of an intent dealt with it specifically; Congress created a statutory presumption: it provided that if at any time within five years after naturalization the alien took permanent residence in a foreign country that act would be prima facie evidence of the lack of intention to become a "permanent" citizen and would be sufficient to cancel a certificate as fraudulent in the absence of countervailing evidence. To declare by law that a subsequent occurring event shall be prima facie evidence of fraud was a radical departure from the rules of evidence concerning the proof of that most difficult of all things to prove, a fraudulent state of mind. Such a restricted statement as Congress set forth in the presumption cannot be considered as letting down the bars for any subsequent conduct to be prima facie evidence of any other previously existing state of mind, especially concerning attachment or allegiance. Had Congress so intended to

---

[16] Case below D.C.S.D.N.Y., 184 F. 643, 1911.

likewise alter the rules of evidence so long and so well established, it was not inarticulate. As said in the Ozawa case, supra, "it may be assumed that its purpose would have been definitely disclosed and its legislation to that end put in unmistakable terms." Or as more recently said in Davies Warehouse Co. v. Bowles, 1944, 321 U.S. 144, 64 S.Ct. 474, 481:

"If Congress had deemed it necessary or even appropriate that the Administrator's order should in effect be final in construing the scope of national price-fixing policy, it would not have been at a loss for words to say so."

The limitation on the presumption must be noted; it is evidence only of lack of intention to become a *"permanent"* citizen of the United States, i. e., the intention to *reside* permanently in the United States.

The fact that of the great number of requirments Congress put in unmistakable terms this one presumption alone is almost conclusively indicative that it intended to limit the rule to intention of residence, and not to make it a general rule for the proof of fraud.

In light of the holdings in all of the other cases considered by the Supreme Court subsequent to it, the Luria case cannot be considered as authority as to what generally constituted "fraud" under the Act as that term is used in apposition to the term "illegal procurement." The fact that the Attorney General argued that Luria's conduct was fraudulent regardless of the presumption (231 U.S. at page 16, 34 S.Ct. 10, 11, 58 L.Ed. 101) and that the Court, while not specifically rejecting it, did not accept that contention, is indicative that the Court did not so agree, although of course not conclusively so.

The Luria case hence must be considered as limited in its authority to cases involving residence, except that it is authority for the proposition that a suit to cancel citizenship is a proceeding in equity.

Passing now to a consideration of the statement in some of the cases as to the scope of Section 15 compared to appeal, and to appearance in opposition to naturalization.

Under the terms of Section 11 of the Act, 34 Stat. 599, 8 U.S.C.A. § 399, the United States could appear and contest a naturalization proceeding in any court.

Section 11 reads as follows:

"Sec. 11. That the United States shall have the right to appear before any court or courts exercising jurisdiction in naturalization proceedings for the purpose of cross-examining the petitioner and the witnesses produced in support of his petition concerning any matter touching or in any way affecting his right to admission to citizenship, and shall have the right to call witnesses, produce evidence, and be heard in opposition to the granting of any petition in naturalization proceedings." [17]

In the Ness case Justice Brandeis held that the remedy afforded by Section 15 for setting aside certificates of naturalization was "broader" than an equity suit to set aside a judgment, as laid down in the Throckmorton case and Kibbe v. Benson, 84 U.S. 624, 17 Wall. 624, 21 L.Ed. 741, but was "narrower" in scope than the protection afforded the Government under Sec. 11. And in the Tutun case, Justice Brandeis said that Section 15 is also "narrower" in scope than the reveiw commonly afforded by appeal. This doctrine is announced again in the Schneiderman case, 320 U.S. at page 125, 63 S.Ct. at page 1336, 87 L. Ed. 1796.

Now, if Section 15 is *broader than equity* as outlined in the Throckmorton case, but *narrower than the right* of the Government to contest under Section 11, and narrower than the right of *review on appeal* then such proceeding under 15 must lie somewhere between the wide latitude of review on appeal, or of contest under Section 11 on the one hand, and the narrower scope of an equity suit to set aside a judgment on the other hand.

An equity suit to set aside a judgment must come within the narrow limits of fraud as defined in the Throckmorton case, supra, and related cases. And such fraud, previous to 1906 was the only ground of voiding naturalization certificates in an independent suit. Norsch; Gleason, supra. Obviously Congress in *creating* the *additional ground of illegal procurement* by Section 15, *broadened the remedy for cancellation*.

The remedy here sought by the Government is not narrower than the rights afforded the Government under Section 11, but much broader. Here the Government seeks to cancel the citizenship of defend-

---

[17] Under the Nationality Act of 1940 this became subdivision (d) of Sec. 334, 8 U.S. C.A. § 734.

226

ant, without regard to the testimony which was given by two (or more) witnesses at his naturalization hearing; whereas under section eleven the decision as to whether or not the petitioner can be naturalized is determined by the evidence before the court on that hearing. Under Section 11, all the government can do if it is dissatisfied is to appeal.

Likewise the power now asserted, instead of being narrower is broader than the power on appeal.

On appeal, the court has power to decide *all* questions of law, but is limited on its re-examination of the facts to those occasions *only* when it is asserted that there is no substantial evidence in the record to support the judgment of the verdict. Then the Court may examine the record "not for the purpose of weighing conflicting testimony, but only to determine whether there was *some evidence,* competent and substantial, *before the jury, fairly tending to sustain the verdict.*" Abrams v. United States, 250 U.S. 616, at page 619, 40 S.Ct. 17, at page 18, 63 L.Ed. 1173. Instead of being narrower than that, the position asserted in this instant case by the Government is likewise much broader, as the court is not asked to ascertain if there was *some* evidence which might *tend* to sustain the judgment in the naturalization proceeding, nor even just to weigh whatever conflicting testimony there was; but to weigh the evidence of at least two witnesses which this court has never seen (*without any disclosure* by allegation or affidavit as to *what* that evidence was) upon which the defendant was recommended for admission and admitted, against conduct and evidence which was not then in existence, and to give its solemn judgment after such weighing, that the defendant was possessed of a certain mental state twelve years before the complaint was filed against this defendant Kusche. What court on appeal does that?

### Res Judicata.

As hereinbefore indicated, the requirements and prohibitions relating to a citizenship proceeding fall into three classes, procedure, status, and attitudes.

From the previous discussion it must be regarded as settled that a judgment of admission is not res judicata as to any of the things which would support a judgment for "illegal procurement" as those things are set out earlier in this opinion. The prescribed requirements and prohibitions are "preliminary jurisdictional prerequisites" to the power of the court to grant a judgment of naturalization. Each requirement or prohibition is a condition precedent to the one that follows, and taken together they constitute the source of the court's power to finally act by making a judgment. And if there is absence or non-compliance with any of them, then a judgment lacks jurisdiction and may be set aside for "illegal procurement."

This is so whether such absence or non-compliance is patent or latent, or whether there was false swearing, i. e., intrinsic *fraud* concerning them or not. But such non-compliance is not "fraud" as that term is used in the first paragraph of Section 15.

The next step in the inquiry is to ascertain if the judgment of naturalization is likewise not res judicata as to the attitudes of the petitioner.

Some attitudes are positive and some are required to be negative. The negative ones are those which are prohibited specifically to the petitioner if he would be naturalized. They are in two classes, political and moral (or religious). The political attitudes specifically prohibited are, anarchy, political assassination, overthrow of the government by force and violence. The moral (or religious) attitude specifically prohibited is polygamy. The positive attitudes are those which the petitioner is required to possess and are three: (1) He must *intend* to reside permanently in the United States (2) he must be attached to the principles of the Constitution of the United States as such attachment shall have been indicated by his "behavior" for the previous five continuous years testified to by at least two credible witnesses who have known him during the five year period and who are citizens of the United States and (3) he must be of good moral character, which is likewise established by his behavior proved in the same manner as his behavior concerning attachment.

The requirements of the statute relating to attitudes are found in two sections: Section 7 and Section 4.

The second paragraph of the 2nd subdivision of Sec. 4 reads:

"The petition shall set forth that he is not a disbeliever in or opposed to organized government, or a member of or affiliated with any organization or body of persons teaching disbelief in or opposed to organized government, a polygamist or be-

liever in the practice of polygamy, and that it is his intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly by name to the prince, potentate, state, or sovereignty of which he at the time of filing of his petition may be a citizen or subject, and that it is his intention to reside permanently within the United States, and whether or not he has been denied admission as a citizen of the United States, and, if denied, the ground or grounds of such denial, the court or courts in which such decision was rendered, and that the cause for such denial has since been cured or removed and every fact material to his naturalization and required to be proved upon the final hearing of his application." (Formerly 8 U.S.C.A. § 379, now 8 U.S.C.A. §§ 709, 732.)

Section 7 reads (Formerly 8 U.S.C.A. § 364, now 8 U.S.C.A. § 705.)

"Sec. 7. That no person who disbelieves in or who is opposed to organized government, or who is a member of or affiliated with any organization entertaining and teaching such disbelief in or opposition to organized government, or who advocates or teaches the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the Government of the United States, or of any other organized government, because of his or their official character, or who is a polygamist, shall be naturalized or be made a citizen of the United States."

The fourth subdivision of Section 4 reads as follows (Formerly 8 U.S.C.A. § 382, now 8 U.S.C.A. §§ 707, 709, 712, 727):

"Fourth. No alien shall be admitted to citizenship unless (1) immediately preceding the date of his petition the alien has resided continuously within the United States for at least five years and within the county where the petitioner resided at the time of filing his petition for at least six months, (2) he has resided continuously within the United States from the date of his petition up to the time of his admission to citizenship, and (3) during all the periods referred to in this subdivision he has *behaved* as a person of *good moral character, attached* to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States. At the hearing of the petition, residence in the county where the petitioner resides at the time of filing his petition, and the other qualifications required by this subdivision during such residence, shall be proved by the oral testimony of at least two credible witnesses, citizens of the United States, in addition to the affidavits required by this act to be included in the petition. If the petitioner has resided in two or more places in such county and for this reason two witnesses cannot be procured to testify as to all such residence, it may be proved by the oral testimony of two such witnesses for each such place of residence, in addition to the affidavits required by this act to be included in the petition. At the *hearing,* residence within the United States but outside the county, and the other qualifications required by this subdivision during such residence shall be proved either by depositions made before a naturalization examiner or by the oral testimony of *at least two such witnesses for each place of residence."* (Italics supplied)

The matter of intention to reside in the United States permanently is disposed of in the discussion of the Luria case, supra, and will not be dealt with further.

It is observed that the prohibitions cover the field of belief in anarchy, polygamy, and political assassination, whether the attitude is subjective or objective; but that as to attachment that prohibition is against the objective attitude only, that is, his behavior.

There are disclosures and representations which the applicant is required to make as to his attitude on the certain specified things, viz., anarchy, polygamy, and political assassination, whether such attitude is just a matter of unexpressed belief—a purely subjective state—or if his attitude has resulted in acts of advocacy by him of those things. The power is prohibited to the court to naturalize the applicant if the disclosures reveal such specified beliefs or conduct.

On the other hand, as to good moral character and attachment, the court is prohibited the power to naturalize the applicant *only if he has not behaved* as a person of good moral character or as a person attached to the principles of the Constitution and the behavior as to attachment does not depend upon the disclosures or representations of the petitioner as do the disclosures of anarchy, etc. *No matter* what *he says* about his attachment, *it is his behavior which counts.*

Attachment and allegiance are the important things in connection with a man's naturalization. And they are recognized as such by the Act of Congress; all other things can be proved by the mere naked assertion of the applicant, but a man's attachment and his good moral character cannot be proved by the applicant himself, but must at least be proved by two "credible witnesses" who are citizens of the United States and who have known the defendant for five preceding years for each place he has lived, and will testify under oath, and on cross examination by the naturalization examiner or the court that the man has "behaved" as one attached and as a man of good moral character: If these qualified vouchers appear and so testify, then Congress will accept his oath of allegiance with finality and beyond attack, except for extrinsic fraud.

Behavior as to attachment and good moral character, as well as compliance with all the things which might generally be classed as procedural, are established by the law as the measuring stick of verity in his oath.

Now, if the petitioner should represent that he was not a polygamist, or not an anarchist, or not a political assassin, and did not believe in them and secured his naturalization, and if it were subsequently disclosed that before he was naturalized he had committed acts which would indicate such belief; or if he did make such disclosures on his application for citizenship and the court nevertheless naturalized him, then, in either event, there would be a violation of the prohibitions of the Act which are expressed as definite ascertainable standards, in words which have a common and well understood meaning, viz., disbelief in or opposition to organized government, polygamy, and advocacy of killing officers of this or any other organized government. And, measured by the standards applied by the Supreme Court in the cases hereinbefore discussed, such a judgment of naturalization would be "illegally procured." It would *not* be res judicata as to the petitioner's attitudes on anarchy, polygamy, or political assassination or overthrow of the Government by force and violence. The absence of the required attitude on those things is the absence of another "preliminary jurisdictional prerequisite."[18]

These conclusions coincide with the views expressed by Justice Douglas in his concurring opinion in the Schneiderman case. And while that opinion is not that of the Court and hence not binding authority, it is nevertheless the highest authority which has yet spoken on the subject.

With the attitudes of the petitioner on these specifically prohibited things coming within its ambit, "illegal procurement", covers everything required or prohibited in connection with a naturalization proceeding, except the petitioner's attitude on two things, viz., attachment and allegiance (and his good moral character, which is not here involved).

Hence, the question now arises as to whether or not the judgment of admission is res judicata as to attachment and allegiance, and if so to what extent. If it is not res judicata the judgment of admission may be cancelled on the ground of "illegal procurement" as with other procedural prerequisites.

The manner of their establishment and proof in the naturalization proceedings is in itself an indication that a judgment as to their existence is not to be examined and reexamined as procedural requirements are; they can be proved in only one way—two witnesses qualified in fact as credible, as citizens and by knowing the petitioner the required period, must be able to testify as to the petitioner's behavior at every place he has lived during the previous five years. He might have as few as two or as many as ten or more. If there are less than two witnesses, or if it is later established that the witnesses did not know him for five years or did not live where he did so as to be able to know his "behavior" or if they did not testify as to his behavior at all, or if they were not citizens, then the Schwinn case, supra, establishes that the judgment would be vulnerable on the ground of illegal procurement, because such things are procedural.

But if the witnesses did know him, if they did live where he did so as to be able to know his "behavior" and if they did testify as to his behavior, and if the nat-

---

[18] This conclusion assumes that there is no constitutional objection to the petitioner to possess these attitudes, but neither makes nor suggests any conclusion on the point as none of these three beliefs are involved in the instant case. Nor is the advocacy of the overthrow of the Government by force and violence involved in this case.

turalization Examiner found, and the Court accepted the finding, that his "behavior" was as a person, "attached to the principles of the Constitution", and of "good moral character," then the judgment of admission should be and is res judicata, on attachment and allegiance, and *can be attacked only on the ground of extrinsic fraud.*[19]

In addition to what has heretofore been said this conclusion is supported, if not compelled by general principles and the cases on res judicata which will now be discussed.

 Ordinarily, the defense of res judicata cannot be considered except when pleaded as defensive matter. But on a suit to set aside a judgment, which judgment of course must be alleged in the complaint, the effect of that judgment must be considered when determining whether or not the complaint states a cause of action on a demurrer or a motion to dismiss.[20]

 That does not preclude a defendant, however, from asserting res judicata as a special defense or claiming that other facts or issues were adjudicated which do not appear on the face of the complaint.

 The doctrine of res judicata has been variously stated. Without repeating all the definitions and the varying shades of thought, let it suffice to quote from 34 Corpus Juris page 743, Paragraph 1154, "*Any right, fact, or matter in issue, and directly adjudicated upon, or necessarily involved in,* the determination of an action before a competent court, in which a judgment or decree is rendered upon the merits, is conclusively settled by the judgment therein and cannot again be litigated between the parties and privies whether the claim or demand, purpose, or subject matter of the two suits is the same or not." (Italics supplied)

 The Johannessen case, supra, decided in 1911 held that a naturalization proceeding was an ex parte matter and not res judicata. It was not settled then and was more unsettled after the Ness case, supra, in 1917 that an order of admission to naturalization was an appealable order or final judgment where the Court said "Congress did not see fit to provide for a direct review by writ of error or appeal." This question was not settled until 1929 when the Tutun case, supra, definitely held that a proceeding was a "case" and that the order admitting an alien to citizenship was a final judgment and that a direct appeal would lie.

The Johannessen case as well as the Ness case must be read in the light of the decision in the Tutun case as well as the Act of June 8, 1926, 44 Stat. 709, 8 U.S.C.A. § 399a, which later amendment authorized the designation, by the Courts, of naturalization examiners and prescribed their duties, giving them power "to make findings."

The Ness case held that even though the United States appeared under Section 11, and opposed the granting of a petition, the judgment was not *res judicata as to preliminary procedural prerequisites, ·but* that decisions of a State Court of Naturalization on the "competency or weight of evidence or the credibility of witnesses" were, though clearly erroneous, *conclusive even as against the U. S., if it entered* an appearance under paragraph 11.[21]

The Johannessen case concerned a certificate granted in 1892 by a state court under the law as it existed prior to the Naturalization Act of 1906. It must be remembered that it was decided when it was thought no appeal would lie from a judgment of naturalization. The Court by repeated statements in the Opinion, limits its decision to naturalization granted ex parte, without notice to the Government or the public, without opportunity, "to say nothing of duty," on the part of the Government to appear, and when the whole proceeding was "conducted at the instance of and controlled by the interested individual alone."

That such was not the situation in the naturalization of this defendant which oc-

---

[19] What is here said of attachment and allegiance is likewise true of "good moral character," as it is to be ascertained by the applicant's behavior.

[20] Napa Valley Electric Co. v. Railroad Comm., D.C., 257 F. 197; Hooker v. East Riverside Irr. Dist., 38 Cal.App. 615. 177 P. 184; Freeman on Judgments (1925 Ed.) p. 1694 Fed. cases there cited.

[21] No reason for any distinction between such decisions of a "State Court of Naturalization" and a Federal Court of Naturalization are perceptible. Nor does it appear why the competency or weight of evidence or credibility of witnesses, should be called "minor questions" as these are the things upon which most law suits are decided.

curred in 1930 is readily apparent upon examination of the requirements of the Act of 1906 and June 8, 1926.

Among many other things the Act of 1906 required that one who thereafter arrived in the United States must attach to the petition his certificate of arrival, which could only be secured from the Department of Commerce and Labor, which was the Department having control of the Naturalization service. Hence there was *notice* to the Government. Obviously, such notice was necessary, else the United States would not be able to appear under Section 11 and make a contest.

The procedure which the law exacted from the applicant in 1930, required that he take twelve different steps for the completion of his citizenship. These steps and the accompanying statutory references were submitted in a memorandum by the plaintiff. Eleven of these steps were before the oath of allegiance. In the consideration of the complaint, it is presumed they were followed, there being no allegation to the contrary.

At the time defendant was admitted, the law then required an alien desiring to become a citizen to take the following steps:

(1) While still in the foreign country, he had to make an application for an immigration visa and get a quota number from the American Consul, who could, and after 1924 must, refuse it if he was non-admissible or ineligible to citizenship;[22-23]

(2) Upon arrival in the United States the alien was again examined by at *least two* immigrant inspectors who had the "power" to subpoena witnesses, take evidence, administer oaths, and to refuse admission if the alien was non-admissible or *ineligible to citizenship;*[23A]

(3) He must make a written "Statement of Fact and *Preliminary* Form For Declaration of Intention," on a form he had to secure from the office of the Immigration and Naturalization Service and which form he left with them (It is noted that this is not the Declaration of Intention);[23B]

(4) The Immigration and Naturalization Service then secured his Certificate of Arrival and attached it to the executed "Statement of Fact and Preliminary Form" which the Naturalization Service then sent to the Clerk of the Court where the alien was to be naturalized;[23C]

(5) The Immigration and Naturalization

---

[22] The American Consul in the alien's country could (and after 1924 must) refuse a visa and quota number, and the immigrant inspectors (he must be examined by two, T. 8 U.S.C.A. § 152) could refuse his admission into the country, if the alien's political beliefs did not square with the commands of the law that he be not an anarchist, a disbeliever in organized government, a believer in overthrowing the Government of the United States by force and violence, a polygamist, a believer in political assassination, or a teacher of any of these things, and could also exclude him if he had been convicted of or admitted the commission of a felony or other crime involving moral turpitude; *but the alien* could not be excluded on the ground that he had been convicted or admitted the commission of, or taught or advocated the commission of an "offense purely political."

[23] This footnote with its sub-paragraphs A to K inclusive are a condensation of the statutory references contained in the special memorandum furnished by the Naturalization Service of the plaintiff.

Quota numbers are not required of natives of the Western Hemisphere, of spouses of American citizens, or of aliens who arrived prior to July 1, 1921.

Act of May 19, 1921, 42 Stat. 5, as amended May 11, 1922, 42 Stat. 540, as amended by Sec. 2 of the Immigration Act of 1924, 43 Stat. 153, 8 U.S.C.A. § 202, which prohibited visa or quota numbers to non-admissible aliens.

[23A] Act of February 5, 1917, 39 Stat. 885-887, 8 U.S.C.A. §§ 152-154.

(Prior to Act of February 5, 1917, substantially the same examination of aliens on their arrival in the United States was conducted under the Basic Immigration Act of 1907, 34 Stat. 898.)

[23B] Rule 6, Naturalization Regulations of July 20, 1935; 8 CFR 385.

Forms: Sec. 3 of Act of June 29, 1906, 34 Stat. 596, now Sec. 327 (d) Nationality Act of 1940, (8 U.S.C.A. § 727 (d).

Rule 3, Naturalization Regulations of July 20, 1935 (now 8 CFR 361).

[23C] If alien arrived before June 29, 1906, no certificate of arrival is required. Prior to June 30, 1929, certificate of arrival was not secured until the alien made application to file petition for naturalization.

Sec. 4 of Act of June 29, 1906, 34 Stat. 597, as amended by Sec. 4 of Act of March 2, 1929, 45 Stat. 1513, as amended by Act of May 25, 1932, 47 Stat. 166;

Service then sent a notice to the applicant to appear before the Clerk of the Court to make his Declaration of Intention. The Declaration of Intention is actually prepared by the Clerk, and is signed and sworn to by the alien in the Clerk's presence, and cannot be sworn to anywhere outside the Clerk's office;[23D]

(6) The alien in not less than two, nor more than seven years, if he has complied with the residence requirements can then secure another form from the Immigration and Naturalization service called "Statement of Fact and Preliminary Form for Petition for Naturalization," which he fills out;[23E]

(7) He files that form and leaves it with the Immigration and Naturalization Service, who subsequently notify him to appear with two witnesses;[23F]

(8) In response to the notice he appears with his witnesses where they are examined and may be cross-examined under oath, and then the Petition for Naturalization is prepared by the Immigration and Naturalization Service;[23G]

(9) The alien then takes his petition for naturalization to the Clerk of the Court and files it, at which time both he and his witnesses are again put under oath and sworn by the Clerk;[23H]

(10) Thereafter, upon notice, the alien and his witnesses again appear before a "Designated" Examiner where they are again put under oath and submit to examination and cross-examination by that officer;[23I]

(11) The "Designated Examiner" makes his findings, and if they are favorable, after thirty days notice notifies the alien to appear in court for his final hearing;[23J]

(12) Upon that appearance a *motion for*

---

now Sec. 329 (b) Nationality Act of 1940, 8 U.S.C.A. § 729 (b).

Rule 4, Naturalization Regulations of July 20, 1935; (now 8 CFR 363 and 370)

Forms: Rules 3 and 6. Naturalization Regulations of July 20, 1935 (now 8 CFR 365)

[23D] Acts of April 14, 1802, and May 26, 1824 (sec. 2165, Revised Stat. (1878) as amended by Sec. 4, Act of June 29, 1906, 34 Stat. 596, as amended by Sec. 1, Act of March 4, 1929, 45 Stat. 1545, 1546 as amended by Sec. 1, Act of June 20, 1939, 53 Stat. 843—now Nationality Act 1940, 54 Stat. 1153, 8 U.S.C.A. § 731; Rule 6 Natl. Regs. July 20, 1935 (now 8 CFR 365)

[23E] See Footnote D (supra) and Rule 7, Sub. A. Naturalization Regulations of July 20, 1935; now 8 CFR 370.

If the alien is married to a citizen of the United States he may proceed toward naturalization without a Declaration of Intention but must have a certificate of arrival if arrival was after June 29, 1906, and must establish residence in the United States for one, two or three years depending upon the date of marriage or upon the spouse's acquisition of citizenship. This requirement of the Declaration of Intention is also waived in cases of certain seamen and veterans. In all other respects these cases follow the same procedure hereinafter set forth with the exception of those serving or honorably discharged from the armed forces of the United States in the present war.

[23F] Now 8 CFR 370 and see Footnote 23E

[23G] Section 4 of Act of June 29, 1906, 40 Stat. 544, now Section 327 (c) Nationality Act of 1940, 8 U.S.C.A. § 727 (e).

Paragraph 1, Subdivision G, Rule 1, Naturalization Regulations of July 20, 1935; now 8 CFR 60.3 and 370.8.

[23H] See Footnote [23D] and Act of June 29, 1906, 34 Stat. 596, now 8 U.S.C.A. § 732.

[23I] Where the designated examiner system is not used, petitioner and his witnesses are examined in open court at the final hearing. The designated examiner system was instituted in 1926. It is not used universally throughout the United States, but is the practice in most cities having a large number of naturalization cases.

Act of June 8, 1926, 44 Stat. 709, 710; now Section 333 Nationality Act of 1940, 8 U.S.C.A. § 733.

Subdivision O, Rule 1, Naturalization Regulations of June 20, 1935, now 8 CFR 373.

[23J] If the Immigration and Naturalization Service does not recommend favorably, the petitioner will be notified by the Service to appear in Court for his final hearing. Such notice will state whether the Service objects to his naturalization or desires to bring the facts of his case to the attention of the Court. Petitioner and his witnesses may be cross-examined and confronted with witnesses against petitioner, and he is entitled to present evidence on his own behalf. If the court finds in favor of the petitioner, the oath of allegiance may be administered to him then.

Time: Sec. 6, Act of June 29, 1906,

*the admission* is *made by the Government Representative upon* the findings theretofore filed, and if granted, the oath of allegiance is taken, the order entered, the petitioner signs his certificate in the Clerk's Office and the Clerk issues the certificate.[23K]

The precise place in all these proceedings where a man ceases to be a citizen or subject of his former country is the judgment, of course. But the final turning point is when the petitioner takes his oath of allegiance. Until the making of the judgment, he is an alien, a subject of another country which can claim his allegiance, collect taxes from him and treat him as a subject. By his oath the alien cuts that tie; by it he purges himself of allegiance to all other powers; by it he swears he will in the future "behave" as a citizen; the taking of the oath is the climactical act to him; all that went before is but prelude. During the five years of orinetation, he owes his allegiance to and is a subject of his previous country, but during that time, as a demonstration of the truth or falsity of his oath, if and when he takes it, he must have "behaved" as a person attached to the principles of the Constitution and be of good moral character. That "behavior" is the warrant to the court of the truth of his oath.

The office of Designated Naturalization Examiner was created by the Act of June 8, 1926. They were authorized to be designated by the Court to "take testimony concerning *any matter touching or in any way affecting the admissibility of any petitioner for naturalization,* to subpoena witnesses, and to administer oaths, to make *"findings and recommendations."* Such findings should be "submitted to the Court at the final hearing * * * with the recommendation that the petition be granted or denied or continued with the reasons therefor," and "must be signed by the designated examiner." The Judge to whom findings and recommendations are submitted, "shall by written order approve" or disapprove such recommendation and must make or refuse an order of admission. 44 Stat. 709.

At at least eight of the foregoing described steps he was interrogated or examined by a Government official. At several he was examined concerning the political beliefs specified in the Act and finally he and his witnesses were examined by a "Designated Examiner" (named by the Court) whose duties are prescribed by the Naturalization Regulations to be *"to investigate thoroughly the qualifications and eligibility of applicants for citizenship and their* witnesses." The regulations also provide that, "Both the applicant and the *witnesses shall be carefully interrogated to determine whether applicant—* * * * *is attached to the principles of the Constitution, and is well disposed to the good order and happiness of the United States."* [24]

This examination is made out of the presence of the Court. The petitioner has no lawyer. There are none of the time honored rules which govern examinations or cross-examinations of witnesses in court,

---

34 Stat. 598, now Sec. 334 (c) Nationality Act of 1940, 8 U.S.C.A. § 734 (c).

As to Recommendation: Act of June 8, 1926, 44 Stat. 709, 710, now Sec. 333 (a), Nationality Act of 1940, 8 U.S.C.A. § 733 (a).

As to Right to Cross-Examine: Sec. 11, Act of June 29, 1906, 34 Stat. 599, 8 U.S.C.A. § 734 (d) now Sec. 334 (d) of Nationality Act of 1940.

Subdivision O, Rule 1, Naturalization Regulations of July 20, 1935, 8 CFR 373.

[23K] Act of April 14, 1802, and May 26, 1824, Sec. 2165 R.S. as amended by Paragraph 3, Sec. 4 and Secs. 9 and 12 of Act of June 29th, 1906 (34 Stat. 597, 600) as amended by Act of June 8th, 1926, 44 Stat. 709, 710, as amended by Act of June 20th, 1939, 53 Stat. 844, repealed and substituted by Secs. 333, 335, and 337 of Nationality Act of 1940, 8 U.S.C.A. §§ 733, 735, 737.

Naturalization Regulations of July 20, 1935, Subdivisions A and C of Rule 8; Subdivision C of Rule 2, and Subdivision B of Rule 3; (Now, 8 CFR 365, 375, 377).

Naturalization Rules and Regulations issued under the authority of the Nationality Act of 1940, were the first to be issued with citation to the Code of Federal Regulations. Prior to that time they were maintained under the heading of Naturalization Rules and Regulations. All references to 8 CFR herein refer to the Rules and Regulations promulgated under the Nationality Act of 1940.

Prior to the Nationality Act of 1940, ninety days must have elapsed between filing and the admission to citizenship by the court. Sec. 6, Act 1906, amended by 46 Stat. 1511.

[24] Naturalization Regulations in pamphlet form issued under date of July 20th, 1935, Page 70, Subdivision G. Ss. 1 and 2; now CFR Tit. 8, Sec. 370.8 and 373.-1.

to restrain the Designated examiner. None but, that he shall "investigate thoroughly" and "interrogate carefully," the alien and his witnesses. To ascertain his beliefs and allegiance, the "mind and conscience of the applicant may be probed by pertinent inquires." [25]

Such procedure does not bear the slightest resemblance to an ex parte matter, without any notice to the government, or under the control of the petitioner.

From the time the alien institutes in the country of his origin, with the American Consul, his application for a visa quota number, until the final oath he is not opposing any Government officer or agency, or proceeding without them. But the Government literally takes the alien by the hand and leads him through this maze of forms, questions, examinations and re-examinations, and oath and swearings, including his education in the principles of the Constitution. The Government in effect is the alien's guide and mentor, and for all practical purposes had control of the proceedings. The alien can abandon his desire, or verbally express his desire to proceed, but he cannot do anything about it. *At no time can the applicant move forward towards his naturalization without going to the Naturalization Service of the Government or using the forms they supply to him, and in fact cannot go forward without the aid and assistance of the Government.*[26]

Whatever they once might have been, it can hardly be said that proceedings in either the Land Office, the Patent Office or the Copyright Office are now comparable to such repeated challenges by the Government.

Moreover, it is stated in the Schneiderman case, supra, on this point (320 U.S. at page 135, 63 S.Ct. at page 1341, 87 L.Ed. 1796) "As pointed out before, this is a denaturalization proceeding, and it is a judgment, not merely a claim or a grant, which is being attacked."

The holding in the Tutun case, supra, that a naturalization proceeding is a "case"

and that the order of admission is a "judgment" cannot now be questioned.

In the Maney case, supra, it was pointed out that compliance with the requirement involved there "was a *condition attached to the power* of the Court." Somewhere along the line the "power of the Court" which is the power to decide and make a judgment, must be exercised. The only thing left outside of the scope of "illegal procurement," and upon which the court can exercise its "power" are, attachment, good moral character, and allegiance. And the immediate "conditions" attached to the exercise of that "power" (if the other conditions are fulfilled) are that the witnesses shall be qualified in fact, and that they testify that the applicant has "behaved" as a person of good moral character, attached to the principles of the Constitution for the immediately preceding five year period. When these "conditions" have been complied with, and if the applicant takes the oath prescribed by statute, the Court is then authorized to use its judicial "power" and make a judgment of admission as a citizen.

Congress must have intended that *something should be settled by such a "judgment" in such a "case."*

As already demonstrated, by the text of the law, its history and the decisions of the Supreme Court, the mode, manner, times, procedure, and some status matters as well as the petitioner's attitude on anarchy and the like are preliminary jurisdictional prerequisites which *are not settled* by the judgment, but may be re-examined at any time, and the judgment voided for noncompliance.

The range of such things in naturalization proceedings, far exceeds matters long regarded as jurisdictional in other "cases" which result in "judgments."

So this wide range of matters—preliminary jurisdictional prerequisites—not being settled, what is?

The only remaining things involved on a naturalization judgment, as pointed out, are

---

[25] United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; United States v. MacIntosh, 283 U.S. 605–616, 51 S.Ct. 570, 572, 75 L.Ed. 1302.

[26] If after the final examination the Designated Examiner decided to recommend *unfavorably*, he was required to inform the petitioner of his "right to

appear before the Court in person with his witnesses for the final hearing, of which date he shall be notified" Naturalization Rules and Regulations, July 20, 1935, Page 75, Subdivision O Paragraph 3, Title 8 CFR 373.1. But it does not appear that the alien could secure a special date for his hearing.

234

the petitioner's attachment to the Constitution and his allegiance—his political beliefs —the status of his "mind and conscience" on attachment and allegiance. These are the substantive things with which a naturalization proceeding is concerned; they are the things that are "necessarily involved" in the judgment; they are the things put in issue—nothing else is. If they are in issue that is what the judgments act on. If the judgment acts on these matters they are settled by the judgment. If they are settled by the judgment, they are res judicata.

 Being res judicata, the findings of attachment and allegiance in the judgment admitting a petitioner cannot be attacked in a suit to set aside that judgment by a simple assertion that someone falsely swore concerning them in the naturalization proceeding, that is for intrinsic fraud.

Nor can they be attacked except by allegations of *extrinsic* fraud—the kind of fraud which traditionally vitiates judgments as described in the Throckmorton case, Vance v. Burbank, 101 U.S. 514, 25 L.Ed. 929 and kindred cases.

 Whether or not a person is of "good moral character" is likewise a question which is settled by his "behavior" proved in the same manner as attachment, and is settled with the same finality.

In the concurring opinion of Douglas J., in the Schneiderman case, 320 U.S. at page 165, 63 S.Ct. at page 1356, 87 L.Ed. 1796, it is said "where all the express statutory conditions precedent are satisfied we should adhere to the view that the judgment of naturalization *is final and conclusive except for fraud.*"

There is nothing in the Johannessen case; the Ness case, or the main opinion in the Schneiderman case which are not in reconciliation with this view, or which can be held to indicate or suggest that the doctrines relating to extrinsic fraud as set down in the Throckmorton and related cases are inapplicable under Section 15 to a suit to cancel on the ground of fraud, or were excluded by that Section as a ground for vitiating judgments of naturalizaton.

Proceeding then, to a discussion of the requirements for pleading fraud.

The elements of that "traditional fraud" as set forth in the Throckmorton case are well known and have been heretofore quoted and will not be here repeated.

In that connection, however, it will be interesting and illuminating to note several other authorities.

Pico v. Cohn, 1891, 91 Cal. 129, 25 P. 970, 971, 27 P. 537, 13 L.R.A. 336, 25 Am. St.Rep. 159, is a much quoted and cited case. There it was alleged that after the final affirmance of the judgment on appeal, the plaintiff made the discovery that the defendant had paid a witness two thousand dollars to testify falsely. That act is subornation of perjury, but the court in holding it was not extrinsic fraud said:

"The particulars of this bribery and its discovery are detailed in the complaint, and show that on the very morning that Johnson gave his testimony Cohn placed $2,000 in the hands of one Forbes with directions given in Johnson's presence to pay it to him if he testified to an absolute sale, and that, immediately after he had so testified, he demanded and received the money.

"It is averred, and we think sufficiently shown, that upon proof of these facts there is a reasonable certainty that plaintiff would upon another trial gain his cause. Such being the case, is plaintiff entitled to a decree vacating and annulling the former decree on the ground that it was procured by fraud? After a careful and extended examination of the authorities, we are constrained to answer this question in the negative. That a former judgment or decree may be set aside and annulled for some frauds there can be no question, but it must be a fraud extrinsic or collateral to the questions examined and determined in the action. And we think it is settled beyond controversy that a decree will not be vacated merely because it was obtained by forged documents or perjured testimony. The reason of this rule is that there must be an end of litigation; and when parties have once submitted a matter, *or have had the opportunity of submitting it, for investigation and determination, and when they have* exhausted every means for reviewing such determination in the same proceeding, it must be regarded as final and conclusive, unless it can be shown that the jurisdiction of the court has been imposed upon, or that the prevailing party, by some extrinsic or collateral fraud, has prevented a fair submission of the controversy. What, then, is an extrinsic or collateral fraud, within the meaning of this rule? Among the instances given in the books

are such as these: Keeping the unsuccessful party away from the court by a false promise of a compromise, or purposely keeping him in ignorance of the suit; or, where an attorney fraudulently pretends to represent a party, and connives at his defeat or, being regularly employed, corruptly sells out his client's interest. United States v. Throckmorton, 98 U.S. [61] 65, 66 [25 L.Ed. 93], and authorities cited.

"In all such instances the unsuccessful party is really prevented by the fraudulent contrivance of his adversary from having a trial; but when he has a trial he must be prepared to meet and expose perjury then and there. He knows that a false claim or defense can be supported in no other way; that the very object of the trial is, if possible, to ascertain the truth from the conflict of the evidence, and that necessarily the truth or falsity of the testimony must be determined in deciding the issue. The trial is his opportunity for making the truth appear. If unfortunately he fails, being overborne by perjured testimony, and if he likewise fails to show the injustice that has been done him, on motion for a new trial, and the judgment is affirmed on appeal, he is without remedy. The wrong, in such case, is, of course, a most grievous one, and no doubt the legislature and the courts would be glad to redress it if a rule could be devised that would remedy the evil without producing mischiefs far worse than the evil to be remedied. Endless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice; *and so the rule is that a final judgment cannot be annulled merely because it can be shown to have been based on perjured testimony; for, if this could be done once, it could be done again and again, ad infinitum.*"

In Flood v. Templeton, 152 Cal. 148, at page 155, 92 P. 78, 81, 13 L.R.A.,N.S., 1579, the rule was thusly stated: "The rule is that it will not relieve when the fraud charged relates to matters upon which the judgment was regularly obtained and *where an opportunity was given to the party against whom it was entered to contest the matters in issue*, or present any defense which was available, fraud which was directed to or bore upon the claim in issue which was before the court for determination, as when a judgment is entered on a fraudulent claim, or is procured by false testimony, where the party had an opportunity to be heard as to these matters."

What greater opportunity is there in any kind of a proceeding to "contest the matters in issue" than is given the officers, inspectors, and naturalization examiners in a naturalization proceeding?

Freeman on Judgments, Vol. 3, p. 2567, 5th Ed.1925, *put the accent* on perhaps the main distinction between intrinsic and extrinsic fraud; "It must be borne in mind that it is *not fraud in the cause of action but fraud in its management*, which entitles a party to relief."

Things which are essential to be proved are essential to be alleged. The complaint, when objection is made, must be made to show on its face the elements of extrinsic fraud, in order to withstand the objection that it does not state a cause of action.

This question of pleading lies at the threshhold of a court of equity and cannot be sidetracked as a trivial or a minor issue, in order to get at the "larger" issues of the merits. The sufficiency of the complaint in any fraud action is as big as any question in the law. By permitting a little less and a little less to be stated in a complaint which compels a person to hire lawyers to come to court, get witnesses, and stand trial, the substantive rights of persons, one of which is the right not to be sued except for good cause stated, is destroyed, so that by merely pointing the finger of suspicion every person becomes liable to the annoyance, cost, and perhaps destruction of reputation which can come from a mere accusation of fraud.

The peculiar importance of a proper pleading in naturalization cases is emphasized in the concurring opinion of Justice Rutledge in the Schneiderman case. All of it is pertinent, but the following quotation serves the point (320 U.S. at page 165, 63 S.Ct. at page 1356, 87 L.Ed. 1796): "Immediately we are concerned with only one man, William Schneiderman. Actually, though indirectly, the decision affects millions. If, seventeen years after a federal court adjudged him entitled to be a citizen, that judgment can be nullified and he can be stripped of this most precious right, by nothing more than reexamination upon the merits of the very facts the judgment established, no naturalized person's citizenship is or can be secure. If this can be

done after this length of time, it can be done after thirty or fifty years."

In Wood v. Carpenter, 101 U.S. 135, at page 140, 25 L.Ed. 807, the Court held that in fraud cases "The plaintiff is held to stringent rules of pleading and evidence, 'and especially must there be distinct averments as to the time when the fraud, mistake, concealment, · or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made.' * * * 'A general allegation of ignorance at one time and of knowledge at another are of no effect. If the plaintiff made any particular discovery, it should be stated when it was made, what it was, how it was made and why it was not made sooner.' "

In the Throckmorton case it is said (98 U.S. at page 70, 25 L.Ed. 93): "In fact, one great if not fatal defect in the bill is the absence of any declaration of the means by which the fraud has been discovered or can be now established." And in that case the court held that the complaint did not state a cause of action to cancel a land grant, where far greater details were specified and correlated in the complaint than are attempted here.

It must not be overlooked that in the Luria case the lower Court held definitely that the complaint did not state a cause of action, but did not dismiss because (184 F. at page 648) "that point, however, was not raised, and I suppose the defendant does not mean to raise it." The Supreme Court made similar comments. 231 U.S. 9, at page 17, 34 S.Ct. 10, at pages 10, 11, 58 L. Ed. 101.

United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747, was referred to with approval in the Luria case, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101. It held that the right of the Government to institute a suit to cancel a land patent for fraud "depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit."

In another case to set aside a land grant, United States v. Stinson, 1905, 197 U.S. 200, 25 S.Ct. 426, 49 L.Ed. 724, the Court said that such suits should be *"sustained only when the allegations on which this* is attempted *are clearly* stated and fully sustained by proof."

There is nothing· in the new Rules of Civil Procedure which eliminates these requirements. Indeed, it re-iterates them; "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Federal Rules of Civil Procedure, rule 9 (b), 28 U.S.C.A. following section 723c.

Coming now to the complaint in this case:

It is doubtful if any court anywhere, in an action between private parties would hold upon objection, that a complaint stated a cause of action, for fraud if no more were alleged in it than here. ·

In short, the complaint charges the defendant with doing only one act, viz., he joined the Bund four· years after he became a citizen.

, From this one act the pleader concludes that there must be imputed to the defendant on a date four years prior to the act a false oath as to three things, viz., attachment to the principles of the Constitution of the United States, allegiance to the United States, and intention to reside permanently in the United States. These things are so, the pleader likewise concludes, because the Bund advocated, taught .and demanded, the "totalitarian principles of National Socialism," allegiance to Germany, and lack of attachment to the principles of the Constitution of the United States.

Assuming, but not deciding, that defendant's Bund affiliations were sufficient to prevent his citizenship in the first place, the ·question is finally reduced to this—does the complaint contain any of the allegations which have been held to be necessary to state a cause of action for avoidance of a judgment on the ground of extrinsic fraud?

There is no allegation that, although given repeated opportunity by the law, the plaintiff ever made an inquiry, before the judgment of naturalization, as to whether · or not defendant believed in National Socialism, as to what organizations he belonged to, as to whether or not he belonged to any organizations, political or otherwise, and there is no allegation that he did not voluntarily disclose these things; there is no allegation that the defendant had been informed in any citizen-training program

conducted under the general auspices of, or in any text book published by, the plaintiff [27] or that he otherwise knew, that he could not entertain or express certain political beliefs, and still be attached to the Constitution of the United States. Indeed, it is presumed that the defendant had been informed by the plaintiff or otherwise, and that he knew, that the first amendment to the Constitution provided that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble."

The plaintiff's attachment to the principles of the Constitution of the United States was proved by the testimony of two credible citizens of the United States, if the statute was followed, and it must be presumed it was, there being no allegation to the contrary. But there is no allegation that those two citizen witnesses or either of them swore falsely about his attachment or his behavior or anything at all. Indeed, not the slightest inkling is given as to what those two witnesses testified to at all.

Can it be that the alien is guilty of fraud as to what his thoughts and beliefs are, because he did not disclose (if he did not disclose) them to an examiner voluntarily? He had been repeatedly asked if he was an anarchist, or a polygamist, or believed in assaulting or killing officials of this or other governments, or believed in overthrowing this government by force and violence. Must he then in addition to that disclose to the naturalization officials, voluntarily, his opinions and beliefs on the entire gamut of *actual and possible* political views? Must he voluntarily run the political scale to the designated examiner from the simple form of organized government of aboriginal tribes to the most controversial of modern political organizations? Where should he begin? And where should he stop his expression of political beliefs with the Naturalization examiners? He had been taught the principles of the Constitution. He had been taught what was proper for the peace, good order and happiness of the United States, and what allegiance was, under the auspices of the Naturalization Service if they obeyed the commands of the law.[28] And there is no allegation or even intimation

that they did not comply with the statute. Was not the alien entitled to believe that these teachings comprehended the full scope of attachment and allegiance, and if he agreed with them to so indicate, without further elaboration of his political or racial beliefs?

" * * * because of our firmly rooted tradition of freedom of belief, we certainly will not presume in construing the naturalization and denaturalization acts that Congress meant to circumscribe liberty of political thought by general phrases in those statutes," said the Supreme Court in the Schneiderman case, 320 U.S. at page 132, 63 S.Ct. at page 1340, 87 L.Ed. 1796.

Neither the Schwimmer case, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889, nor the Macintosh case, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302, can be considered as authority to the contrary, as in each of those cases, the alien either refused to take the oath of allegiance, or admitted to the examiner a lack of attachment to the principles of the Constitution. Moreover, if these could be considered as authority to the contrary, their power in that respect is destroyed or weakened by the acceptance in the Schneiderman case, 320 U.S. at page 135, 63 S.Ct. at page 1341, 87 L.Ed. 1796, of the dissents in each of them.

There is no allegation that the defendant did any single thing to conceal his membership in these organizations, or that his membership was secret, or that the purposes, objects and activities of the organization were not known to the plaintiff or were secret; or that there was any secrecy about them at all; or that the defendant attempted to conceal his membership; or that the organization attempted to conceal its existence and activities.

The complaint contains no allegation as to when plaintiff discovered that defendant belonged to those organizations; nor of what action the plaintiff took to discover defendant's membership, or his beliefs; there is nothing said to show that the Government acted with reasonable diligence, or any diligence, after making the discovery of membership and purposes.

There is no allegation of any duress, menace, or undue influence of any kind by the defendant upon the government or any of its officers or agents in the procurement

---

[27] Act of May 9, 1918; 40 Stat. 542, at 544; Subdivision N, Par. 1, Naturalization Regulations July 20, 1935.

[28] See Footnote [27].

of his citizenship, or of any negligence, disability, wrongdoing, fraud or failure of duty on the part of any such officers.

What wrongdoing is alleged in the complaint? Nothing, except that the defendant made a false oath; not an oath about anything capable of autoptic proof, but a false oath about his thoughts, his ideas and feelings; things which were in his mind alone, beyond the ken or observation of any person, except as his acts, his conduct, or his words, i. e., his behavior might reveal them. And as to those things—behavior—conduct—under our system where reason and law prevails—have been recognized as the only safe criterion of testing what is in a man's mind. Congress in recognition of that essential principle of liberty provided that behavior was the test of belief. The amendment to Sec. 4 by the Act of 1929, in effect when defendant was naturalized, continued just as all the previous acts had done, to recognize "behavior" during the five year period and such behavior only as the test of attachment to the principles of the Constitution.[29]

In the day to day trial of persons charged with crime, there is hardly a case but that the Government or the defendant ask and the Courts give, an instruction to the jury to the effect that the *acts* of the defendant are the true tests of intent and state of mind.

The complaint and its supporting affidavit are searched in vain for the assertion of any course of conduct, any "behavior" of this defendant, indeed any single act or deed or word done or spoken by this defendant during the five year period previous to his naturalization.

What acts or conduct or words of the defendant are set up in the complaint? It is not asserted that the defendant did anything until four years after he had attained, as a citizen, a status of equality with the native citizen in all respects save eligibility to the Presidency alone. And then after a chasm of four years, during which not one single act or word or deed is alleged, what did the defendant do? He joined an organization which, however reprehensible *its* purposes were, he joined as a citizen. If his act in joining that organization or anything he said or did while a member of or in connection with it, was prohibited by law, then should he not be treated as a citizen who would do the same thing, and suffer the same penalty any other citizen would? For me to hold that conduct first manifested in 1934 is proof of a belief on a date four years previous, is for me to judicially declare that it is impossible for a human being to change his mind, and that a condition of mind shown to exist today is presumed to have existed for at least the previous four years. Where in the precepts of reason or human experience is there support for a principle of law which would thus petrify thought? To so hold, is also to fly in the face of a principle asserted by the Supreme Court without deviation from the case of Osborne v. Banks, 1824, 9 Wheat. 738, 827, to the Schneiderman case in 1943, that a naturalized citizen becomes a member of society possessing all the right of a native citizen and standing in the view of the Constitution, on the footing of a native; that the Constitution does not authorize Congress to enlarge or abridge these rights; and that he is distinguishable in nothing from a native citizen, except so far as the Constitution makes the distinction.

There is one thing upon which there is unanimity of opinion in the Schneiderman case, viz; that the behavior of the defendant for the five year period previous to his naturalization is the test of his beliefs.

The court said (page 133 of 320 U.S., 63 S.Ct. at page 1340, 87 L.Ed. 1796): "On its face the statutory criterion is not attachment to the Constitution, but *behavior* for a period of five years as a man attached to its principles and well disposed to the good order and happiness of the United States. Since the normal connotation of behavior is conduct, there is something to be said for the proposition that the 1906 Act created a purely objective qualification, limiting inquiry to an applicant's *previous* conduct;" (320 U.S. at page 143, 63 S.Ct. 1345, 87 L.Ed. 1796). The Court refers to the fact that the 1928 platform of the Communist party was adopted after the petitioner's naturalization in 1927 and was "hence not strictly relevant:" (320 U.S. at page 147, 63 S.Ct. at page 1347, 87 L.Ed. 1796). "Since the immediate problem is the *determination with certainty* of petitioner's *beliefs from 1922 to 1927*, events and writings since that time have little relevance, and both parties have attempted to confine themselves within the limits of that critical period." (320 U.S. at page 151, 63

---

[29] Act March 2, 1929, 45 Stat. 1513.

S.Ct. at page 1349, 87 L.Ed. 1796). "The Government also sets forth excerpts from other documents which are entitled to little weight because they were published *after the critical period*:" (320 U.S. at page 155, 63 S.Ct. at page 1351) "of the relevant prior to 1927 documents" certain ones have certain authors.

The dissenting opinion agrees with this principle but diverts on other grounds. Says the dissent: 320 U.S. at page 170, 171, 172, 63 S.Ct. at pages 1358, 1359, 87 L.Ed. 1796. The question for decision "is whether petitioner, in securing his citizenship by naturalization, has fulfilled a condition which Congress has imposed on every applicant for naturalization—*that during the five years preceding his application* 'he has behaved as a man * * * attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same.' Decision whether he was lawfully entitled to the citizenship which he procured, and consequently whether he is now entitled to retain it, must turn on the existence of his attachment to the principles of the Constitution when he applied for citizenship, and that must be inferred by the trier of facts *from his conduct during the five-year period.* * * * The question then is not of petitioner's opinions or beliefs—save as they may have influenced or may explain his conduct showing attachment, or want of it, to the principles of the Constitution. * * * Our concern is only that the declared will of Congress shall prevail—that no man shall become a citizen or retain his citizenship whose behavior for five years before his application does not show attachment to the principles of the Constitution." And 320 U.S. at pages 181, 182, 63 S.Ct. at page 1363, 87 L.Ed. 1796: "In determining, whether there was evidence supporting the finding of petitioner's want of attachment to constitutional principles, courts must look, as the statute admonishes, to see whether in the *five year period* the petitioner behaved as a man attached to the principles of the Constitution. And we must recognize that such attachment or want of it is a personal attribute to be inferred from all the relevant facts and circumstances which tend to reveal petitioner's attitude toward those principles."

If the evidence is thus limited to conduct during the five year period previous to naturalization, then by what token can it be asserted that a complaint states a cause of action for cancellation for fraud which contains no allegations at all of conduct during the five year period?

 Upon one other point there is unanimity in the Schneiderman case; the requirement that the evidence for setting aside a naturalization decree shall be "clear, unequivocal, and convincing." At one point it is said that the evidence must go so far, that it "does not leave the issue in doubt."

If the evidence must be clear, unequivocal, and convincing upon what premise can it be said a complaint states a cause of action when there is alleged only acts subsequent to naturalization which at best are entitled to "little weight," and are "not strictly relevant"?

The status of the cases in this Circuit does not compel a contrary conclusion, but if anything they are in agreement with the views and conclusions herein expressed.

The Schurman case, 9 Cir., 264 F. 917, 18 A.L.R. 1182, decided by this Circuit in 1920 is much cited for the competence, relevance and admissibility of evidence of conduct as long as thirteen years after naturalization, without any intervening acts asserted. But that case cannot now be considered authoritative for two reasons. The first one is that it is incompatible with the holdings of the Supreme Court in the Schneiderman case, as hereinbefore indicated; the second is, that it has been disregarded by this circuit in three subsequent decisions; Woerndle case, 1923, 9 Cir., 288 F. 47; Siem case, 9 Cir., 1924, 299 F. 582; and Rowan case, 9 Cir., 1927, 18 F.2d 246.

In the Woerndle case [288 F. 49], the assertion was, as here, fraud in his oath of allegiance; the conduct alleged was pro-German acts, expressions and letters, as well as fraudulent use of a passport after the commencement of the first world war, but before the United States entered it, all occurring after his admission. The Court held his expressions were not sufficient to warrant cancellation, and said, as to the fraudulent use of the passport *"His act, reprehensible and criminal as it is,* can hardly be referred to as indicative of his mental attitude toward the United States at the time when, 10 years before, he was applying for a certificate of naturalization."

The Siem case involved conduct during the five year period prior to his naturalization. It was asserted that he had procured

240

his citizenship by a fraudulent claim of attachment, when in fact he was not attached, and had claimed exemption from the draft during the first World War. *Here was not a mere expression of opinion, here was behavior, during the five year period, and at a time when the United States was at war.* But the court held it was not sufficient evidence of fraud to require cancellation.

In the Rowan case [18 F.2d 248], the defendant subsequent to his naturalization in 1907 and *while the United States was at war* in the first World War, engaged in a course of conduct beginning in 1912, 5 years after his naturalization, which culminated in his conviction under the Espionage Act of that time, and his sentence to imprisonment in 1917. This conduct the court held was "far too conjectural" to form the basis of a cancellation suit.

It is observed that the Siem case and the Rowan case both involved *conduct* at a time when this country was at war, so that they must be considered as destroying whatever authority the Schurman case previously was for the proposition that *expressions* of disloyalty *during a war* are evidence of a fraudulent state of mind on a prior unconnected date.

Further tokens of the intention of Congress to exclude subsequent conduct as proof of a previous fraud are found in the scheme of the law which permits and provides the method and acts necessary for renunciation by, or divestation of, the natural born or naturalized citizen of his citizenship.

The pertinent provisions of that part of the scheme of naturalization and denaturalization first appeared as Section 2 in the Act of March 2nd, 1907. It reads as follows:

"Sec. 2. That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state. 34 Stat. 1228

"When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years: Provided, however, That such presumption may be over-

come on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe: And provided also, That no American citizen shall be allowed to expatriate himself when this country is at war." 34 Stat. 1229

The act remained in this condition substantially without change until the adoption of the Nationality Act of 1940 when more extensive provisions were included in the law for divestation of citizenship.

It specifically provides, 54 Stat. 1168, 8 U.S.C.A. § 801, that a "person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by"; (a) naturalization in a foreign state permanently residing there; (b) taking an oath or making an affirmation of allegiance to a foreign state; (c) entering foreign armed forces, if thereby he acquires nationality of that foreign state; (d) accepting or performing the duties of an officer or employee of a foreign state for which only its nationals are eligible; (e) voting in a foreign election; (f) making a formal renunciation of nationality before diplomatic or Consular officer of the United States in a foreign state; (g) desertion of the military or naval service in time of war; (h) committing an act of treason or attempting by force to overthrow or bear arms against the United States, provided he is convicted by a court martial or by a court of competent jurisdiction.

The Nationality Act of 1940 was in effect before the commencement of the within action. In Sections 401 to 409 inclusive, 8 U.S.C.A. §§ 801–809, it definitely limits and prescribes the acts which can be done subsequent to naturalization by a naturalized citizen to lose his citizenship. Many acts concern derivative citizenship, with which we are not here concerned. And many of them depend upon actual foreign residence of the individual, with which likewise we are not concerned, because from the complaint it does not appear that the defendant has at any time since he arrived in the United States ever taken foreign residence. By Section 408, 8 U.S.C.A. § 808, it is provided, "The loss of nationality under this chapter shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this chapter." And by Section 403, 8 U.S.C.A. § 803, it is provided that "no

national can expatriate himself, or be expatriated, under this section while within the United States * * * " unless he is convicted of desertion of the military or naval forces in time of war, treason, or "attempting by force to overthrow or bearing arms against the United States." [30]

It seems clear to me from the Nationality Act of 1940, that *when conduct subsequent to naturalization alone,* is relied on for cancellation of citizenship, the Government must bring itself within the requirements of Sections 401 to 409 inclusive of that Act. It has not done so, nor made any pretense of doing so.

My conclusion on the third and fourth points may be summarized as follows:

■ (1) "Fraud" is not synonymous with "illegal procurement" as those terms are used in Section 15 of the Act;

■ (2) "Illegal Procurement," results when there is intentional or unintentional disregard for the preliminary requirements or the prohibitions which are set forth in the Act either specifically or by definitely ascertainable standards, (all as hereinbefore in detail set forth and for that reason not repeated here): and this is so, whether there is intrinsic fraud, i.e. false swearing and the like, concerning them or not; compliance in form and in fact with such requirements and prohibitions confers jurisdiction, and absence of such compliance deprives the court of jurisdiction; a judgment as to such requirements and prohibitions is not res judicata; but such judgment may be examined at any time and an independent suit brought under Section 15 and if upon such examination there appears to have been non-compliance in form or in fact with such requirements or prohibitions, the judgment of admission may be set aside on the ground of "illegal procurement":

(3) "Fraud" as used in Section 15, means extrinsic fraud—that fraud which is traditionally recognized as a ground for vitiating judgments.

■ (4) "Attachment" and "allegiance" are general terms which are not defined by the Act or described by definitely ascertainable standards, but such things must be determined by the "behavior" of the petitioner within five years prior to the judgment of admission from the testimony of at least two qualified witnesses for each place where the petitioner has lived during that five year period;

(5) "Attachment" and "allegiance" are in issue in a naturalization proceeding and are settled by the judgment of admission;

(6) Such judgment is res judicata as to the petitioner's attachment and allegiance;

(7) Being res judicata as to such issues it cannot be set aside, except for extrinsic fraud;

■ (8) An action to cancel such judgment for lack of attachment or allegiance will not lie on the ground of "illegal procurement."

(9) The complaint in this case does not allege any acts of the defendant or state any facts which meet the minimum requirements for a complaint to state a cause of action to set aside a judgment on the ground of extrinsic fraud;

■ (10) In the absence of allegations sufficient to state a cause of action for extrinsic fraud, evidence of conduct of the defendant *subsequent to the judgment of* naturalization is inadmissible unless the action is brought under Sections 401 to 409

---

[30] 8 U.S.C.A. § 803, 54 Stat. 1169, 1170, reads as follows:

"§ 803. Restrictions on expatriation; residence in United States;

"(a) Except as provided in subsections (g) and (h) of section 801, no national can expatriate himself, or be expatriated, under this section while within the United States or any of its outlying possessions, but expatriation shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in this section if and when the national thereafter takes up a residence abroad."

Sections (g) and (h) of Section 801, 8 U.S.C.A. 54 Stat. 1168, 1169 are as follows:

"Sec. 801. A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * * (g) Deserting the military or naval service of the United States in time of war, provided he is convicted thereof by court martial; or (h) Committing any act of treason against, or attempting by force to overthrow or bearing arms against the United States, provided he is convicted thereof by a court martial or by a court of competent jurisdiction."

inclusive of the Nationality Act of 1940, 8 U.S.C.A. §§ 801 to 809. The complaint in this case contains no allegations to bring this defendant within those Sections.

For the foregoing reasons the third and fourth objections to the introduction of any evidence and to the sufficiency of the complaint must be sustained. The complaint does not state a cause of action.

### Fifth Objection.

By this objection the defendant contends that the conduct ascribed by the complaint to the defendant was an exercise of the right of freedom of thought, freedom of speech, and freedom of assembly, guaranteed by the First Amendment to the Constitution of the United States.

As heretofore seen, there are no allegations of any acts or "behavior" of the defendant during the five year period prior to his naturalization.

That period is the "critical period" (Schneiderman, supra) and subsequent acts or conduct are not relevant or material without allegations of acts or "behavior" during the critical period.

There is thus no conduct of the defendant before the court to which there can be applied the test of his rights under the First Amendment.

Therefore, the Constitutional question is not properly raised, and any discussion on the subject would be purely speculative, having no proper place in this Memorandum.

For the foregoing reasons, the complaint does not state a cause of action, and the motion to strike all of the evidence is granted, and the objection to the introduction of any evidence is sustained.

Wherefore it is hereby ordered, that the within action be dismissed, and the Clerk is directed to enter judgment accordingly.

Addenda:

A copy of the opinion of the Supreme Court in Baumgartner v. U. S., 64 S.Ct. 1240, has just come to hand. Although Baumgartner was not charged as a member of the Bund, there is nothing in the opinion contrary to the opinions and conclusions herein expressed. On the contrary it supports these views.